## THE JOHN C. SWEENEY.

### THE RELIEF.

CHARLESTON BRIDGE CO. v. THE JOHN C. SWEENEY AND THE RELIEF.

HIGBEE v. CHARLESTON BRIDGE CO. et al.

(District Court, E. D. South Carolina. April 11, 1893.)

1. COLLISION—EVIDENCE—FOUNDATION FOR EXPERT TESTIMONY.
    In a libel against a bridge company for damage to a vessel, alleged to have been caused by improper construction of a draw, evidence that the secretary of war had notified the bridge company that their bridge was an obstruction to navigation; that the bridge had been examined by a board of officers, who prepared plans and directed changes to be made; that the changes were made by the bridge company's engineer; and that the work was examined by an officer representing the secretary of war and the board,—was properly admitted, as showing the opportunities for information which such officer possessed as an expert testifying to the sufficiency of the changes made.

2. SAME—INJURIES FROM DRAW—EVIDENCE.
    A tug having a schooner in tow in mid-stream, with a hawser 190 feet long, passed safely through the draw of a bridge, and the schooner, following straight behind, entered between the fenders of the draw, and proceeded some feet within, when she suddenly sheered, and struck the fender almost bows on. The master of the schooner was at the wheel. There was nothing to show that the current caused the sheer, nor that the tug caused it, and the testimony of the master showed that something occurred which he could not explain. Held, that libels against the bridge company and against the tug must be dismissed, retaining a libel by the bridge company against the schooner for further evidence.

In Admiralty. Libels by the Charleston Bridge Company against the schooner John C. Sweeney and the tug Relief, and by Daniel E. Higbee, master of the schooner John C. Sweeney, against the Charles-

ton Bridge Company and another. The first libel was retained for further testimony; the other two dismissed.

J. F. Ficken and Mitchell & Smith, for libelant Charleston Bridge Company.

J. P. K. Bryan and J. N. Nathans, for respondents.

J. P. K. Bryan, for libelant Daniel E. Higbee.

J. F. Ficken, Mitchell & Smith, and J. N. Nathans, for respondents.

SIMONTON, District Judge. These are a libel in rem and a libel in personam. The original libel in rem was brought by the Charleston Bridge Company against the schooner John C. Sweeney and the tug Relief, for collision with the drawbridge over the Ashley river. The second libel is in personam, brought in behalf of the owners of the schooner John C. Sweeney against the Charleston Bridge Company and the owners of the tug Relief, for damages resulting from the same collision.

The facts immediately attending the collision are easily stated. The schooner John C. Sweeney reached the port of Charleston with a full cargo of coal, to be delivered to the Ashley Phosphate Company at its works on Ashley river above the bridge. She cast anchor off the upper end of the East Battery on the afternoon of 1st December, 1892. The tug Relief was engaged to tow her up the river, and, to that end, left her dock about 4 o'clock of the next morning, proceeded to the schooner, and took her in tow. The hawser by which she was towed was about 190 feet long,—30 to 35 fathoms. When the anchor was up, the master of the Sweeney, who was at the helm, gave the wheel to a seaman and went into the cabin. The tug and tow went down Cooper river, and turned into the Ashley, in mid-stream, the tow following closely the wake of the tug. The bridge spans the river about one and a half miles up, and is in full view for over a mile. Along this bridge at intervals are white lights. The draw is double, divided by a center pier upon which the drawbridge works. There are fenders running out, one on the east side of the eastern draw, and another on the west side of the western draw, above and below the bridge. On the ends of the center pier, and on the end of each fender, is a stationary red light. The drawbridge has a set of pillars and a network of iron as its top hamper. Above this is a line of three lights, so arranged that when the bridge is closed the lamps show a green light to the stream, and when the draw is open a red light. The tug steered for these lights on the draw, and, when the draw opened, took direction for the middle of the eastern draw, the tow following. When about to enter the draw the master took the wheel, a seaman being near him on the quarter. The mate was forward near the bow. The tug entered the draw about midway between the red light on the end of the center pier and that on the end of the easterly fender, and passed through. The schooner in tow entered the opening of the draw, and the mate on the bow on the lookout saw that she was going bows on against the eastern fender. He called out at once, "Starboard! Hard astarboard!" to the master at the wheel, and in a second or two the schooner struck the fender about 30 feet from its outer end, glanced off, and went across the draw, striking the drawbridge, then over the center pier, tearing

away the ironwork, and dislocating the bridge. Her bowsprit was broken off short near the stem, and her cathead was carried away, with damage to her topmast and lines. The time of the collision was just before daylight. The night was clear. The tide was about three quarters flood. The collision was witnessed by two men on the bridge connected with the drawbridge, by the mate of the schooner, and by the mate of the tug, who was at her stern in charge of the tow line.

These libels are the result. They make three questions: Through whose fault was the collision,—the schooner, the tug, or the defective construction of the drawbridge? We must get the answer to these questions from the circumstances immediately attending the collision. There may have been faults with each party. The injury must be the result of, or be contributed to by, such fault. Glenn v. Railroad Co., 21 S. C. 470. What we must discover is causa causans.

Before entering upon this examination we must dispose of a question of evidence raised at the hearing. Under the provisions of the act of congress approved 11th August, 1888, the secretary of war notified the Charleston Bridge Company that their bridge was an obstruction to navigation. A board of officers was appointed, among them Capt. Frederick V. Abbot, of the corps of engineers, who is stationed in this state. This board made their examination and report, prepared proper plans for remedying the evil complained of, and directed the changes to be made. The bridge company employed their own engineer to make the changes required. His work was examined by Capt. Abbot, representing the secretary and the board. When these facts were offered in evidence they were objected to as incompetent, immaterial, and irrelevant. They were admitted subject to exception. Notice had been given that Capt. Abbot would be introduced in the case as an expert. In order that the court could properly appreciate the opinion which he would give as an expert, it was important to know, first, his profession and experience, then the circumstances under which he made his examination and formed his opinion. So, without discussing the constitutionality of the act of congress which was attacked in argument, or the right of the secretary to take the steps which he did take, or the conclusive character of the findings of the board or the right to impugn their finding, these facts showed that Capt. Abbot, the expert, was an officer of the corps of engineers of the army, of high character and ability, who, under the instructions of his superior, made an examination into this bridge, in which he was assisted by other officers of standing; that he himself personally made the examination, and under the sanction of his own official character, and under the orders of his superiors, formed his own conclusions, which conclusions he gave to the court. The facts leading up to this testimony may or may not have been, in themselves and standing alone, competent or material, but, as illustrating the character and value of Capt. Abbot's testimony, they were admitted. Capt. Abbot testifies that in his opinion the bridge, as now constructed, is reasonably safe for navigation. Every bridge built across a navigable stream

more or less obstructs navigation, but the public policy has always permitted the construction of such bridges for public convenience. All that is required is that in the channel of the stream over which they may be built there be secured an opening sufficient in width to permit the passage of vessels using such streams, and that this passage be so constructed with reference to the current as to offer the least resistance possible. An opening perfectly parallel to the current would accomplish this; but in tidal streams, especially in rivers with bends in them, the currents are not uniform in direction, varying their angles at different tides and different stages of the same tide. Over such streams the opening can only be made reasonably safe. So, also, with regard to the width of the draw. It must be reasonably wide. The evidence discloses that in some details this bridge might be defective. The fenders may or may not be of the exact length required, and the distance between the lowest chord of the bridge and the fenders in some cases may be greater than the plans demand. There may be other defects, and the requirements of statute may not all be complied with. If this be so, an indictment may lie against the bridge company as for a public nuisance; but no private person can sustain an action, except for a particular special injury, the direct result of the unlawful character of the obstruction. South Carolina Steamboat Co. v. South Carolina R. Co., 30 S. C. 545, 9 S. E. Rep. 650. So the question remains, was this collision caused or contributed to by any defective construction of the bridge, or by the management of the schooner or the conduct of the tug?

The tug and her tow, when they were proceeding through Ashley river, came in sight of the bridge when opposite to Chisolm's mill. They were then about mid-stream, and the bridge lay straight before them. The course of the tug was directed towards the red light of the center pier. When they were approaching the bridge the usual signals were given for opening the draw, and they were promptly obeyed. The tug then directed her course to the eastern opening, steering for the middle of the opening. The tow followed straight after the tug, and when the latter straightened out for the draw the schooner did so too. The tug entered the draw about the middle of the opening, passed between the center pier and the easterly fender, and went through. The schooner followed in her wake, and entered between the fender and the center pier, and proceeded some feet within the center pier when she was found about to strike the fender almost bows on. This must have occurred suddenly and unexpectedly. Her mate, whose bearing and intelligence produced a most favorable impression on the court, was on the lookout at her bow, and up to that moment he saw nothing indicative of disaster. Just as soon as he saw this, and he saw it when he had just passed the red light abreast of the middle pier, he promptly called out to the helmsman, "Starboard!" and instantly, "Hard a-starboard!" This was the fact of collision. What occasioned it? Not the want of length of the fenders, for the schooner was between the fender and the center pier. Not the obliquity of the current or her speed, for the tug had passed safely through the same current, and at the same speed. Not the want

of height of the fenders, or the want of proper distance from the lowest chord of the bridge to the structure beneath, for the schooner was in the stream, proceeding almost bows on to the fender, striking it and glancing from it, not running over it. There can be no doubt that the schooner sheered at that point. She ceased at this point to follow the wake of the tug. The mate of the tug, at the stern of the tug in full view of the schooner, says that she did. The other witness, the mate of the schooner, who was in a position to know it if it were so, or to deny it if it were not so, is discreetly silent as to the fact. All the witnesses concur in saying that up to that time the schooner was following strictly the direction of the tug. The declarations of the master himself indicate that something occurred with him at the wheel which he himself could neither understand nor explain. Counsel on both sides have presented ingenious theories accounting for this disaster. The fact, however, remains. The schooner made a sheer to starboard in the draw. In that sheer, because of that sheer, she collided. No evidence is given that the current caused it; none that the tug caused it. The most probable cause is that somehow there was a change of her wheel. The mate saw this, for at once he called for a correction of this very thing: "Starboard! hard astarboard!" It may be—it no doubt is—true that the bridge is not perfectly safe, and that by adopting the suggestions of Capt. Brown of the Wistaria it could be made perfectly safe. His suggestion is that proper buoys and anchors could be placed on a line the extension of the center pier; that a vessel approaching the bridge should stop when she reached them, and, by putting out a hawser, could drop through the draw slowly and safely. But the experience of mariners, the usage of the port, the very small percentage of accidents occurring at this bridge since it was remodeled, show that such a course is not imperatively necessary. Above all, this collision of which we are treating did not occur either because the schooner did not stop, or because she was moving at too great speed, or because of any deflection of the current. The most probable solution is the one which has been reached.

It is ordered, that the libels against the tug be dismissed; that the libel against the bridge be dismissed; that it be referred to E. M. Seabrook, Esq., to take testimony as to the damages accruing to the bridge by reason of the collision, and that he report the same.