GILDERSLEEVE et al. v. NEW YORK, N. H. & H. R. CO. et al.

(District Court, S. D. New York. May 24, 1897.)

1. COLLISION WITH RIPRAP OF BRIDGE — ILLEGAL OBSTRUCTION — "DRAW 130 FEET IN THE CLEAR"—LOW-WATER MEASURE SUFFICIENT—APPROVAL BY SPECIAL TRIBUNAL.

In approaching the draw of the Connecticut river at Middletown, the libelant's barge ran upon the riprap foundation of the rest pier, which, below low-water mark, extended outward into the channel way. On the contention that the defendant was maintaining an illegal obstruction of navigation, it appeared that the bridge was built under the state act of June 17, 1868, confirmed by congress in 1869, which act required draws "not less than 130 feet in width in the clear," and that the bridge and draws be located and constructed in such manner and such places and upon such plans as should be approved by a competent board of engineers appointed by the superior court, etc. The bridge was built accordingly, under the supervision and approval of a board of three expert engineers thus appointed, two of whom were Gens. McClellan and Gilmore. The draw space was 130 feet wide in the clear between the abutments down to the level of low water. Below that, the riprap sloping outward diminished the clear space towards the bottom of the river. *Held*, that the contemporaneous construction of the act as requiring the full width down to the level of low water only, the projection of the riprap foundation below being approved by the board of engineers and confirmed by the court, was neither unreasonable nor so plainly contrary to the requirements of the act or the public needs as to render the bridge, approved as above, an unlawful structure; and that the determination of such questions was properly within the province of the special tribunal appointed to determine and to approve the plans.

**2. UNWIELDY BARGE—SHEERING IN SHALLOW WATER.**

The evidence showing that the barge was difficult to handle and liable to take unexpected sheers in shallow water: *Held* on the evidence that the collision should be ascribed to accident rather than to any negligence of the tug.

Sidney Chubb, for libelants.

Henry W. Taft, for New York, N. H. & H. R. Co.

Wilcox, Adams & Green, for the tug.

BROWN, District Judge. This libel was filed against the above railroad company by the owner of the barge Volunteer to recover damages for injuries received by the barge between 1 and 2 a. m. of September 5, 1895, in running upon the riprap foundation of the southerly rest pier of the railroad bridge over the Connecticut river at Middletown, Conn. The barge was going up the river with the flood tide, in tow of the tug Luther C. Ward, upon a hawser about 300 feet long, designing to pass through the east channel of the open draw. Astern of the Volunteer, and on a hawser of about 300 feet, was another barge; and astern of the latter, was a third barge upon a shorter hawser. The draw of the bridge, when open, afforded a clear space of 130 feet measured on a line perpendicular to the face of the piers, and at the level of low water. Each arm, when open, was supported by a smaller independent pier, the lower one being known as the south rest pier. The foundation of the rest piers, like that of the other piers, was sloping beneath the water, being constructed of successive steps outwards from the main pier, termed altars, which were further covered by riprap as a protection to the masonry. In approaching the draw, the Volunteer, in consequence of a previous sheer to the westward, from which she had not wholly recovered, ran up to within 5 or 6 feet of the easterly side of the south rest pier, and drawing 9½ feet of water, her port side thus ran upon the riprap work, and broke some planks so as to let in water enough to cause her to sink a few rods above.

The libelants contend that the bridge is an illegal obstruction and an illegal structure, because the draw is not 130 feet in the clear at the bottom of the river. Upon the petition of the railroad company, the tug was brought in as a party defendant, under the fifty-ninth rule, on the claim that the damage was owing to the negligence of the tug in navigating the tow.

The bridge was originally built by the New Haven, Middletown & Willimantic Railroad Company; but the defendant company appears to be in possession of the bridge, and operating it. The libel contains an indirect averment to that effect; and the answer contains no specific denial of it; so that if the bridge at the time when the accident happened was an unlawful obstruction, the defendant company must be held answerable for the damages properly attributable to the obstruction.

The bridge in question was constructed by the New Haven, Middletown & Willimantic Company, under a resolution of the general assembly of the state of Connecticut approved June 17, 1868, amending the

charter of that company and authorizing the construction of the bridge in the manner therein provided. See 6 Sp. Laws Conn. p. 329.

By that act the company was authorized to construct a bridge "provided with two draws, each of which shall be of such a width as to permit the free passage of the largest vessels navigating said river, and each of which draws shall not be less than 130 feet in width in the clear; said bridge and draws to be located and constructed in such manner and in such place and upon such plan as shall be approved by a competent board of engineers to be appointed by the superior court of Middlesex county upon public notice to parties interested, and opportunity to be heard, as shall be required by order of the court, and finally to make a return of their doings to said court"; and said corporation was "authorized to build and maintain the piers and works of said bridge in the places and in the manner to be designated in the plan which shall be so approved by said board."

The above resolution was confirmed by act of congress, passed February 19, 1869 (15 Stat. 272, c. 37), by which it was enacted, "that said bridge when completed in the manner specified in said resolution and in the place and in accordance with the plans of the board of engineers * * *· shall be deemed and taken to be a legal structure," the right being reserved by the third section to "withdraw the assent hereby given in case the free navigation of said river shall at any time be substantially and materially obstructed by such bridge."

At the April term of 1869, the superior court of Middlesex county, Conn., appointed Charles B. Stewart, George B. McClellan, and O. A. Gilmore a board of engineers under the above resolution and act of congress, and the bridge was subsequently built under their supervision, upon plans and drawings submitted to that board, approved by it, submitted to the court and after public notice accepted and approved by the court; and in 1876, some time after the completion of the bridge, a committee was appointed by the court to inquire whether the bridge had been constructed in accordance with the plans so approved, which reported that it had been so built in all respects; and that report was subsequently confirmed by the court at the September term, 1876, by a decretal order which declared that the court accepted said report and found all the facts and matters reported therein to be true.

The libelants now contend that the bridge was an unlawful obstruction, because the available space of the draw, 130 feet in the clear at the level of low water was not so continued perpendicularly down to the bottom of the river; and because the sloping sides of the piers, built below low-water mark as above stated, gave vessels less available space under water than 130 feet in the clear.

It is manifest that the construction contended for was not the construction of the act adopted at the time, either by the board of engineers appointed by the act, or by the superior court of Connecticut. The written specifications in the plan of the bridge, which have been produced in evidence, provide expressly in reference to draws as follows:

"The draws of said bridge shall consist of two openings each 130 feet wide in the clear at the level of ordinary low water. * * * The foundations of

the piers and abutments shall be constructed upon such plan and in such manner as this board shall approve after the character of the river bottom and the substrata shall have been fully ascertained."

—The drawings signed and approved by all the members of the board show the sloping foundations below low water.

These plans were approved by the court as above stated, and though the drawing of the south rest pier could not now be found, the testimony of Gen. Serrell leaves no doubt that it was similar to that of several of the other piers, the drawings of which were produced.

I am of opinion that the action taken in this case by the board of engineers as ratified and approved by the court, is conclusive as to the lawfulness of this structure at the time. The board of engineers appointed to determine the location, plan and structure of the bridge in conjunction with the court to which it was to report, constituted the special tribunal to which all questions pertaining to the mode of building the bridge, except such as were definitely fixed by the act itself, were referred; and their decisions, while thus acting within the scope of the statute, are binding. No doubt they could not bind the public to violations of any clear provisions of the statute. But particulars not clearly defined by the statute, and the construction of the statute itself, so far as was necessary to determine such details, were necessarily within the province of the board of engineers to determine, and when thus determined and acted on, that determination is a valid defense against the charge of building an unlawful obstruction. The questions relating to the mode of constructing the foundations of the piers below water, and the depth and extent of the unobstructed space at the bottom of the river, were, I think, questions of detail of that character. The act required a width sufficient for the "free passage of vessels of the largest class navigating the river." The evidence shows that at that time the largest draft of such vessels was $9\frac{1}{2}$ feet. The channel way in the draw was from 12 to 13 feet. The act required "the draw to be 130 feet in the clear." A draw, as defined by all dictionaries, is "the movable section of a bridge," whether raised up, as was the earlier practice, or moved to one side, as at present. Literally, therefore, a draw would be 130 feet in the clear, if, when opened, it would leave an open passage of 130 feet measured on the line of the bridge; the board of engineers, however, provided for 130 feet in the clear on the line of low-water mark, as was done in the cases of St. Louis & St. P. Packet Co. v. Keokuk & H. Bridge Co., 31 Fed. 755; Hannibal & St. J. R. Co. v. Missouri River Packet Co., 125 U. S. 260, 8 Sup. Ct. 874.

As the language of the act does not expressly require 130 feet between the piers at the bottom of the river, it should be construed reasonably according to the objects to be attained, keeping in view the circumstances of the time and the existing usage and practice and understanding of engineers skilled in that business. When this bridge was built, the principal part of the navigation of the river was by sail vessels, and tows like those now in use were hardly known. The sails and booms of sailing vessels, as well as oars which are occasionally used, require more space above water than below. A reasonable slope to strengthen the foundation of the piers, therefore, was no

substantial obstruction of the passage; and accordingly bridges were generally so constructed. Gen. Serrell, who prepared these plans, testified to this fact, and that this was the usual understanding by engineers of such statutory provisions. The members of the board of engineers, of which Gen. McClellan was one, were themselves experts of high character. Their testimony could not be had, as all are dead. But their approval of the plan is itself evidence of their construction of the act; and I cannot regard the testimony of Maj. Adams, whose acquaintance with the subject extends but little more than halfway back to the date of this act, as outweighing the above evidence. The action of the war department also, on the report of Maj. Adams upon an investigation made after this accident, does not support Maj. Adams' contention; for the result of this investigation was a requirement that a guard or piles should be driven down around the piers at a distance of 12½ feet therefrom, and that any riprap beyond such piles should be removed. Thus, instead of applying the rule contended for, and requiring a space of 130 feet between the piers at the bottom of the river, the clear space, even above low-water mark, was reduced by the war department to 105 feet. It is not clear that this requirement has not created more obstruction than it has cured. The action of the war department, however, is based upon the act of September 19, 1890 (1 Supp. Rev. St. p. 800, § 4), and upon the reservation above referred to in the act of 1869; and it in no way affects the lawfulness of the structure before any action was taken thereon by the war department.

I have considered the above question as though it related solely to the piers of the draw itself; whereas in fact this accident happened at the rest pier, 130 feet below the bridge. The rest pier, though not strictly a part of the draw, is one of its incidental accompaniments. The language of the statute requiring 130 feet in the clear, cannot be applied literally to the rest pier, since the spaces measured at right angles from the east and west faces of that pier are wholly open and unobstructed for several hundred feet to the bank of the river on either side. The easterly face of the rest pier, moreover, as the evidence shows, was 6½ feet to the westward of the line of the easterly face of the pivot pier; so the point where the Volunteer struck was almost precisely in line with the easterly face of the pivot pier itself, as it stood above water. There was abundant room to the eastward and to the westward of the rest pier, and there is no sound reason for the contention that the few feet of sloping riprap at that point was of itself any material obstruction in the approach to the draw. There is no evidence of previous accidents there; and it must be assumed that the sloping foundations of all the piers was well known to the boatmen accustomed to navigate the river. The construction of such a rest pier being a part of the plan for the support of the draw, and authorized by the act, and being constructed in the mode approved by the board of engineers, and ratified by the court, it cannot be deemed an unlawful obstruction at the time this accident occurred. For the same reason no guards or piles can be held to have been required.

2. As respects the alleged negligence of the tug brought in under the fifty-ninth rule, I do not think the charge is satisfactorily made out.

The Volunteer was a large barge, flat-bottomed and not easily steered in shallow water; and it is shown by the evidence that she was peculiarly liable to sheer indifferently on either side. The tug pursued the customary course, which was always through the easterly channel in going up. Not only her own testimony, but the witnesses from the boats behind, show that below the draw they were heading properly and in the usual manner for the east channel. They were going up with the flood tide at the rate of about 6 or 7 miles an hour; and the Volunteer, when about 600 or 700 feet below the rest pier, and only a short distance to the westward of the center line of the easterly channel, sheered to port until her hawser led about a point to starboard. On a hawser of 300 feet this would give an offing of about 60 feet. While endeavoring to recover her position, the port side of the Volunteer grazed the riprap of the pier, as above stated.

The course of the fleet from a point about 1,000 feet below the draw had been a little to starboard, in order to reach the center of the east channel. The tug, according to the testimony of her pilot, passed about 25 or 30 feet to the eastward of the south rest pier, heading for the center of the passage above. A little before reaching the rest pier, the pilot had looked astern, he says, and saw the tow coming properly. This must have been just before the sheer of the Volunteer was taken. The point where the sheer began being only 600 or 700 feet below the rest pier, it is evident that the Volunteer struck within a minute afterwards, and the attention of the tug's pilot was at that moment occupied with the draw of the next bridge a little above. It was expected by those on the Volunteer that she would clear the rest pier, notwithstanding her sheer. But the flood tide prevented. No hail was given to the tug; and it does not seem to me to constitute negligence in the pilot of the tug that he did not anticipate a sheer by the Volunteer to the westward a moment after he had seen that the tow was following him rightly to go through the draw. or that he did not maintain a constant lookout astern. No evidence of such a practice is given. All the evidence shows that the tug was pursuing the usual course. The fleet was headed for the center of the draw. The sheer of the Volunteer with her heavy weight would, with the tide, draw the tug somewhat to port. The obligation of a tug is only that of reasonable nautical care and skill. I do not think the proof in this case is sufficient to show that the tug was at fault in this respect. The failure of the libelants to join in any such charge, even after the tug had been brought into the case under the fifty-ninth rule, is at least of some significance in this regard. The true cause of the accident was, I think, the liability of the Volunteer to sheer, and the difficulty of her recovery in shallow water. According to the evidence, there was no way in which this liability could be avoided. That the sheer happened at an unfortunate moment must, I think, be set down to accident, and not construed as a fault. See The John C. Sweeney, 55 Fed. 536.

The libel must, therefore, be dismissed, with costs to the defendant company as against the libelants, and with costs to the tug as against the defendant company, under the stipulation.