**PILOT RIVER TRANSPORTATION, INC.,; Upper River Services, Inc., and Wausau Insurance Companies,** Appellees,

v.

**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY,** Appellant.

No. 89–5416.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1990.

Decided Aug. 29, 1990.

David A. Donna, Minneapolis, Minn., for appellant.

Richard D. Zito, Sibley, Iowa, for appellees.

Before MAGILL, Circuit Judge, ROSS, Senior Circuit Judge, and BEAM, Circuit Judge.

ROSS, Senior Circuit Judge.

## I.

This appeal arises from a maritime collision which occurred on May 3, 1985, when a vessel owned and insured by appellees, Pilot River Transportation and Wausau Insurance Companies (collectively referred to as Pilot River), collided with the Pig's Eye Railroad Bridge, owned and operated by appellant, Chicago and Northwestern Transportation Company (C & NW). At the time of the collision, Pilot River's towboat, the M/V Minneapolis, was pushing a tow of three loaded grain barges down the Mississippi River. The collision occurred when the M/V Minneapolis tow struck the stationary protective cell of the Pig's Eye Railroad Bridge.

Prior to the collision, the captain of the M/V Minneapolis, James Bittner, contacted the bridge tender, Ernie Elizondo, to inform him that the M/V Minneapolis was heading southbound down the river and that the bridge should remain open. Elizondo, whose duties included opening and closing the bridge to allow passage of vessels on the river, responded that the bridge was open and would remain open. Minutes later Elizondo was notified that two maintenance workers wanted to board the bridge to perform maintenance work. In order to allow their entry, Elizondo began to close the bridge without previously notifying Captain Bittner.

Captain Bittner testified that when he first suspected that the bridge was closing, he placed the towboat's throttles in the neutral position. When he determined that the bridge was in fact closing, he began reversing engines to slow speed and attempted to contact the bridge tender to determine why the bridge was closing. When he received no response, Captain Bittner continued backing on his engines.

When Elizondo responded to a second call from Captain Bittner, Elizondo explained that the bridge was momentarily closing but that it would begin to swing open as soon as the workers stepped foot on the bridge. Captain Bittner did not indicate that the momentary bridge closing would cause any problems for his vessel. Following this conversation, Captain Bittner continued to reverse his engines and at this time the M/V Minneapolis and its tow began to lose shape.

The area just upstream of the bridge is known as the "chute," because the river increases in speed due to wing dams and the river narrowing at this location. Pilot River claims that it was impossible to stop the M/V Minneapolis and its tow once it had entered the chute. Prior to entering the chute, Captain Bittner received confirmation that the bridge was open and would remain open for the M/V Minneapolis' clear passage. Bittner then entered the chute in reliance on the bridge tender's confirmation. Shortly thereafter, the bridge began to close; at this point however, the M/V Minneapolis and its tow had already entered the chute and were, therefore, committed to passage.

Captain Bittner did not attempt to use the shore to beach or slow his tow, which he testified would have caused the vessel to "top around," thereby endangering the vessel and its crew. Instead, he maneu-

vered the barges toward a shear fence located upstream of the bridge near a sheet pile protective cell. The tow then struck the protective cell of the bridge, resulting in the claimed damage.

The district court found that the collision was caused solely by C & NW's negligence in failing to keep the bridge open for the passage of the M/V Minneapolis and its tow, and in failing to communicate the bridge tender's intention to close the bridge after previously agreeing to keep it open. Relying on 33 U.S.C. §§ 494 [1] and 499,[2] the court held that C & NW had violated its statutory duty of care to keep the bridge open after reasonable signals were given by the approaching vessel. The district court also found that C & NW had violated 33 C.F.R. § 117.15(b)(5) [3] by failing to communicate, in a timely fashion, the bridge tender's intention to close the bridge contrary to his prior agreement to keep it open. The district court further found that there was no contributory negligence on the part of the M/V Minneapolis. Damages were awarded to Pilot River in the amount of $43,382.14, plus interest and costs.

On appeal, C & NW contends that the district court erred in finding that C & NW owed a statutory duty of care to the M/V Minneapolis, that Pilot River was not contributorily negligent, and that damages for cargo loss and survey fees were incorrectly assessed. Upon careful review of the record and the arguments and briefs of the parties, we affirm.

**II.**

■ C & NW first argues that the district court erred in finding that it violated a statutory duty of care. C & NW contends that the statutory and regulatory provisions relied upon by the district court, 33 U.S.C. §§ 494, 499 and 33 C.F.R. § 117.15(b)(5), apply to drawbridges only, and because the bridge at issue is a swing bridge, the court incorrectly applied these provisions. Furthermore, C & NW contends that because swing bridges and drawbridges are specifically distinguished in other regulations, the drafters could not have intended the provisions of sections 494 and 499 to apply to swing bridges.[4]

We disagree with C & NW's interpretation of the relevant statutory and regulatory provisions. No similar regulations exist which relate specifically to the signaling requirements of a swing bridge. The logical conclusion to be drawn from C & NW's argument is that swing bridge activities are consequently not regulated. We are not persuaded by this argument. The term "draw" has been defined as the movable section of the bridge, whether raised up or moved from side to side. *See Gildersleeve v. New York, N.H. & H.R. Co.*, 82 F. 763, 766 (S.D.N.Y.1897). In fact, bridges such as that at issue herein are frequently referred to as "swing draw bridges." *See, e.g., Penn Cent. Co. v. Buckley & Co.*, 415 F.2d 762, 763 (3d Cir.1969); *Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204, 209 (5th Cir.), *cert. denied*, 393 U.S. 983, 89

---

**1.** 33 U.S.C. § 494 provides:

No bridge erected or maintained under the provisions of [this Act] shall at any time unreasonably obstruct the free navigation of the waters over which it is constructed.... If the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft.

**2.** 33 U.S.C. § 499 provides:

It shall be the duty of all persons owning, operating, and tending the drawbridges ... to open, or cause to be opened, the draws of such bridges under such rules and regulations as in the opinion of the Secretary of Transportation the public interests require to govern the open-

ing of drawbridges for the passage of vessels and other water crafts, and such rules and regulations, when so made and published, shall have the force of law.

**3.** 33 C.F.R. § 117.15(b)(5) provides:

When the draw cannot be opened immediately, or is open and shall be closed promptly, the sound signal to acknowledge a request to open the draw is five short blasts sounded in rapid succession not more than 30 seconds after the vessel's opening signal. The signal shall be repeated until acknowledged in some manner by the requesting vessel.

**4.** For example, 33 C.F.R. §§ 118.70–118.85 impose differentiated lighting requirements on swingbridges, single-opening drawbridges, bascule bridges and vertical lift bridges.

S.Ct. 449, 21 L.Ed.2d 444 (1968). Clearly, 33 U.S.C. §§ 494 and 499 and its concomitant regulations apply to all forms of "drawbridges," including "swing bridges."

C & NW next argues that even if it owed a statutory duty of care to Pilot River, the district court was clearly erroneous [5] in finding that a breach of this duty occurred. It claims that there is no absolute duty which requires that a bridge be opened immediately after a vessel has signaled, but instead requires only that the bridge be opened within a reasonable time so that an approaching vessel has sufficient time to maneuver past the bridge. According to C & NW, the bridge was opened in sufficient time to allow the safe passage of the M/V Minneapolis, and instead it was Captain Bittner's unreasonable reaction to the momentary bridge closing which caused the collision.

Again, we are not persuaded by this argument. The bridge tender violated his duty to contact the vessel before closing the bridge. *See* 33 C.F.R. § 117.15(b)(5). Because of the unannounced bridge closing, Captain Bittner reasonably took evasive actions to avoid collision. We conclude that the district court was not clearly erroneous in finding that C & NW was negligent and had violated its statutory duty of care.

### III.

C & NW next argues that the district court erred in its factual finding that Captain Bittner's evasive maneuvers were prudent seamanship and did not constitute contributory negligence. It argues specifically that Bittner was negligent in three respects: (1) in failing to maintain control of his tow, (2) in taking emergency action after being notified that the bridge would

only be closed momentarily, and (3) in failing to proceed through the right descending channel to the right descending shore.

The district court found that Bittner took reasonable precautions and exercised prudent seamanship to avoid collision. He slackened speed and attempted to assess the situation when he saw that the bridge was closing in contravention of the passage agreement with the bridge tender. The district court was not clearly erroneous in making this determination.

### IV.

C & NW also takes issue with the district court's assessment of damages. First, it argues that it was improperly assessed damages for what it terms "cargo loss" in the amount of $4,834.69, which relates to the grain cargo carried by one of the barges. Of this amount, $3,931.81 was due to an increased foreign material count in the barge's cargo. C & NW argues that the district court erred in awarding such damages because the variance in the foreign material count was not proximately caused by its actions.

One of the barges was damaged during the collision and its cargo of soybeans had to be transferred to another barge. Upon completion of the transfer, it was necessary to issue a new certificate reflecting the grade of the soybeans. During the initial loading, grading was accomplished through an automated process. Following the collision and transfer of the grain to a new barge, however, the new grade was necessarily established by a hand sampling method, which yielded a higher percentage of foreign material. As a result of the increased foreign material count, Pilot River received less in payment for its grain. Pilot River argues that the collision caused

---

**5.** We reject C & NW's argument that admiralty law requires that we apply a "modified" clearly erroneous standard of reviewing the district court's factual determinations. The Eighth Circuit has consistently applied a conventional clearly erroneous standard of review. This court has stated that "[o]ur analyses ... is governed by the well-settled standard for reviewing district court findings in admiralty cases. In *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20, 24 (1954), the United States Supreme Court held: '[i]n reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous.'" *Alter Barge Line, Inc. v. TPC Transp. Co.*, 801 F.2d 1026, 1028 (8th Cir.1986). *See also SCNO Barge Lines, Inc. v. Sun Transp. Co.*, 775 F.2d 221, 224 (8th Cir.1985).

the regrading of the grain, which in turn caused a monetary loss to Pilot River.

We agree with the district court that the collision necessitated the transfer of the barge's cargo, which in turn necessitated a second certificate reflecting the grade of the soybeans. While no additional foreign material was infused into the shipment, the method of grading was necessarily changed as a result of the collision. Therefore, the district court properly held that C & NW's negligence was the proximate cause of this damage.

Next, C & NW argues that the district court erred in awarding Pilot River $3,697.85 in survey fees as part of the compensable damages. It asserts that the cost of surveying damages is considered an expense in investigating the extent of damages and therefore is an expense of the legal defense and not a part of the damages computation.

A distinction is usually drawn in the law of damages in admiralty between survey costs incurred to inspect the opponent's damages, and survey costs incurred to inspect and repair the claimant's damages. The former are deemed to be defense costs; the latter, necessary costs of repair. *In re Ta Chi Navigation (Panama) Corp.*, 513 F.Supp. 148, 155 (E.D.La.1981), *aff'd*, 728 F.2d 699 (5th Cir.1984). *See also Complaint of Valley Towing Serv.*, 629 F.Supp. 139, 146 (E.D.Mo.1985) (court disallowed claim for survey costs of vessels not owned by the claiming party); *Zanzibar Shipping, S.A. v. Railroad Locomotive Engine No. 2199*, 533 F.Supp. 392, 398 (S.D.Tex. 1982) (court allowed survey costs which estimate the damages or repair costs).

The district court correctly awarded the survey costs as damages in this case. The costs incurred were solely for survey of the damages claimed against C & NW, and not for the determination of any other losses.

## V.

Finally, we have considered the other arguments asserted by C & NW, including its argument that the district court erred in admitting certain documents and investiga-

tive files into evidence. We find these arguments to be without merit.

Based on the foregoing, the judgment of the district court is affirmed.