BUNGE CORPORATION, Ranger Insurance Co., Plaintiffs-Appellees, Cross-Appellants,

v.

FREEPORT MARINE REPAIR, INC., Defendant-Appellant, Cross-Appellee.

No. 99-14019.

United States Court of Appeals,

Eleventh Circuit.

Jan. 30, 2001.

Appeals from the United States District Court for the Northern District of Florida. (No. 97-00240-CV-LAC-3), Lacey A. Collier, Judge.

Before DUBINA and HULL, Circuit Judges, and HODGES[*], District Judge.

DUBINA, Circuit Judge:

This admiralty action concerns the definition of a "vessel" for purposes of applying burden shifting principles outlined in maritime case law. The appellant Freeport Marine Repair, Inc. ("Freeport") appeals the district court's $196,500.00 judgment against it after a ship owned by Freeport broke free from her moorings and damaged appellee Bunge Corporation's ("Bunge") grain loading facility. Bunge cross-appeals seeking a higher damage award. We affirm and remand.

## I. FACTS

Freeport manufactured and owned a casino vessel ("Hull No. 40") that was in the final stages of construction at Freeport's facility at Four Mile Creek near Freeport, Florida. By October 3, 1995, funding for completion of the ship dried up resulting in a "vessel" not rigged for steering.[1] By early evening of the same day, Hurricane Opal was nearing Florida's panhandle at approximately 10 mph. Freeport was aware of the impending hurricane, but only made limited preparations because Freeport did not believe Opal would make landfall until October 5. Opal, however, accelerated from 10 to 21 mph, causing Freeport to work from 3:00 a.m. until 11:00 a.m. on October 4, in an attempt to secure Hull No. 40 from the on-coming storm. Both sides dispute the integrity of the preparations conducted by Freeport in anticipation of Hurricane Opal. The district court was unable to find, as a matter of fact, exactly how Hull No. 40 was moored because the cables that

---

[*]Honorable William Terrell Hodges, U.S. District Judge for the Middle District of Florida, sitting by designation.

[1]Freeport argues that Hull No.40 was an "object" not a "vessel" because she had not been subject to sea trials, she was not an instrument of commerce in navigation, or she was not capable of navigation in the water.

broke were not preserved and, thus, not in evidence.[2]

By 11:00 a.m., the weather worsened, and Freeport evacuated its employees. The parties dispute the severity of the weather at the time Hull No. 40 broke free from her moorings. The district court found that the storm approached the coast line with winds up to 150 mph, but by the time it reached Freeport, Hull No. 40 was only subjected to sustained winds between 85 mph and 103.5 mph. By 5:30 p.m., Hull No. 40 broke free from her moorings and drifted to the west bank of Four Mile Creek. While adrift, Hull No. 40 apparently struck and damaged a grain-loading conveyor facility owned by Bunge. The following day Hull No. 40 returned to Freeport's mooring facility under her own power. Bunge brought suit in federal district court seeking recovery of the damages it sustained as a result of Freeport's alleged negligence. The district court entered judgment against Freeport in the amount of $196,500.00.

Freeport appeals the $196,500.00 judgment against it, while Bunge cross-appeals, seeking an increase in the amount of damages awarded. The primary issue in this case concerns Freeport's defense that a ship/object must be a "vessel" in order for the burden shifting principles announced in *The Louisiana,* 70 (3 Wall.) U.S. 164, 173, 18 L.Ed. 85 (1866)(the "Louisiana Rule") to apply.

## II. STANDARDS OF REVIEW

Whether Hull No. 40 was a "vessel" for purposes of the Louisiana Rule is a question of law which is reviewed *de novo. Southern Natural Gas Co. v. Land, Cullman County,* 197 F.3d 1368 (11th Cir.1999); *American Dredging Co., v. Lambert,* 153 F.3d 1292 (11th Cir.1998). The district court's findings regarding the severity of Hurricane Opal are findings of fact that must stand unless clearly erroneous. It is settled that the clearly erroneous standard of review applies in admiralty cases. *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Compania Anonima Venezolana De Navegacion v. Perez Export Company,* 303 F.2d 692, 694 (5th Cir.1962).[3] In reviewing damage awards, this court should reverse only if it finds the award to be clearly erroneous. *Nakajima v. U.S.,* 965 F.2d 987, 990 (11th Cir.1992). This court should not reverse the district court's damage award simply because it may conclude that it would have computed damages differently. *Hiatt v. U.S.,* 910 F.2d 737, 742 (11th Cir.1990).

---

[2]Bunge contended that Freeport's actions constituted spoliation of evidence. The district court disagreed, finding that the cables were disposed of in the process of cleaning up the grounds following the hurricane. On appeal, Bunge argues that spoliation of evidence is an alternative ground upon which this court may affirm the result reached by the district court.

[3]We have adopted as binding precedent all decisions of the former Fifth Circuit, decided prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

## III. DISCUSSION

A.     The Louisiana Rule

We first address whether Hull No. 40 was a vessel such that it was subject to the Louisiana Rule. When a moving ship strikes and damages a stationary object, it is presumed that the moving ship is at fault. *The Louisiana,* 70 (3 Wall.) U.S. 164, 173, 18 L.Ed. 85 (1866); *The Oregon,* 158 U.S. 186, 192-93, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 794-95 (5th Cir.1977). This presumption operates to shift the burden of persuasion onto the moving ship. *Delta Transload, Inc. v. MV Navios Commander,* 818 F.2d 445, 449 (5th Cir.1987). The presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the moving vessel is mishandled in some way. *Id.* It stems also from the observation that "any evidence of actual negligence, or the lack of it, is likely to be known only to the persons on board, who are in the best position to either keep damaging evidence hidden, or bring favorable evidence forward." *United States v. Merchant Mariner's License No. 008075 (Joseph J. O'Connell),* Decision of the Vice-Commandant No. 2465, p. 8 (1981). The presumption is universally described as "strong," *id.,* and as one that places a "heavy burden" on the moving ship to overcome. *Bunge Corp.,* 558 F.2d at 795.

This presumption of negligence may be rebutted by showing, by a preponderance of the evidence, either that the allision was the fault of the stationary object, that the moving vessel acted with reasonable care, or that the allision was an unavoidable accident. *Bunge Corp.,* 558 F.2d at 795. The presumption operates not just against the ship, but against all parties who participated in the management of the vessel. *Woods v. Department of Transp.,* 681 F.2d 988, 990 (5th Cir.1982).

Therefore, when the district court determined that Hull No. 40 fell within the purview of the Louisiana Rule, Freeport had the burden to overcome the presumption that it was negligent in causing damage to the Bunge facility. On appeal, Freeport argues that the Louisiana Rule applies only to vessels, that Hull No. 40 was not a vessel in admiralty, and that the district court, therefore, erroneously applied the Louisiana Rule to Freeport. Because we conclude Hull No. 40 constituted a vessel for purposes of admiralty tort jurisdiction, we hold that the district court correctly applied the Louisiana Rule to Hull No. 40. We need not address whether a ship/object must constitute a vessel as defined elsewhere in admiralty jurisprudence in order for the Louisiana Rule to apply.

Our analysis, then, begins with admiralty jurisdiction. Historically, admiralty tort jurisdiction

depended solely upon the locality of the wrong. *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 253, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) ("If the wrong occurred on navigable waters, the action [was] within admiralty jurisdiction; if the wrong occurred on land, it [was] not."). The Supreme Court, however, rejected the "purely mechanical application of the locality test," concluding that "the wrong [must also] bear a significant relationship to traditional maritime activity." *Id.* at 261, 268, 93 S.Ct. 493. This second prong is commonly termed "the nexus test." *Id.* Thus, we must consider the situs of the allision (locality test) as well as the relationship between the unmooring of a partially constructed ship and traditional maritime activity (nexus test) in order to determine admiralty jurisdiction.

We consider first whether Hull No. 40 passes the locality test. In *The Plymouth,* 70 U.S. (3 Wall.) 20, 36, 18 L.Ed. 125 (1866), the Supreme Court stated that "[e]very species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance." To satisfy this test, the tort need only occur on navigable waters. *See id.* In this case, Hull No. 40 broke free from her moorings on the east side of Four Mile Creek, drifted across to the west side of Four Mile Creek where it struck the Bunge grain loading facility. The injury to Bunge's property clearly occurred on navigable waters and, thus, satisfies the locality test.

We next determine whether Hull No. 40's allision with the Bunge facility bears a significant relationship to traditional maritime activity. The nexus test presents two queries: (1) Did the incident have a "potentially disruptive impact" on maritime commerce? *Sisson v. Ruby,* 497 U.S. 358, 363, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990); and (2) does a "substantial relationship" exist "between the activity giving rise to the incident and traditional maritime activity?" *Id.* at 364, 110 S.Ct. 2892. As to the first query, "a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Id.* at 363, 110 S.Ct. 2892; *Sea Vessel v. Reyes,* 23 F.3d 345, 350 (11th Cir.1994). No actual disruption of maritime commerce need occur in order to satisfy this query, rather the law requires that we examine the "general features" of this type of incident. *Id.* Here, a partially constructed vessel broke free from her moorings and drifted unattended down Four Mile Creek, damaging property along side the waterway. Clearly, Hull No. 40 was not only a potential disruption to commercial activity, it was an actual disruption.

As to the second query of the nexus test, we must determine whether there was "a substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Sisson,* 497

U.S. at 364, 110 S.Ct. 2892.[4]  The relevant activity in the instant case was the construction of Hull No. 40 and the mooring of Hull No. 40 on the navigable waterway of Four Mile Creek.  Therefore, we must determine whether the construction and mooring of Hull No. 40 on Four Mile Creek had "a substantial relationship to traditional maritime activity." *Id.* at 365, 110 S.Ct. 2892. Certainly, some case law suggests that a vessel under construction may not be subject to admiralty jurisdiction.  *Thames Towboat Co. v. The Francis McDonald,* 254 U.S. 242, 244, 41 S.Ct. 65, 65 L.Ed. 245 (1920) (holding that contracts to construct entirely new vessels are non-maritime); *Hatteras of Lauderdale Inc. v. Gemini Lady,* 853 F.2d 848, 849-50 (11th Cir.1988) ("Until a vessel is completed and launched it does not become a ship in the legal sense, and therefore admiralty jurisdiction does not exist."); *Certificate No. 14880 v. Suwannee River Spa Lines, Inc.,* 866 F.2d 752, 759 n. 3 (5th Cir.1989) (construction contracts for new vessels are not within admiralty, but "tort claims for negligent construction or design of a vessel will be in admiralty if the negligence constitutes a maritime tort.").  Such cases, however, have little effect on the present case because they involve jurisdiction based in contract, whereas this case involves jurisdiction based in tort.

Although a pre-nexus case, the Supreme Court in *Tucker v. Alexandroff,* 183 U.S. 424, 438-39, 22 S.Ct. 195, 46 L.Ed. 264 (1901), addressed whether a vessel under construction may be subject to admiralty jurisdiction.  In essence, the Court held that a vessel in its stocks could not be made liable in admiralty, either *in rem* or *in personam.* The Court did state, however, that "[i]n the baptism of launching she receives her name, and from the moment her keel touches the water she is transformed, and becomes a subject of admiralty jurisdiction." *Id.* at 438, 22 S.Ct. 195.[5] Like the vessel in *Tucker,* Hull No. 40 was launched and floating in a navigable water way. Moreover, in *Bender Shipbuilding & Repair Co., Inc. v. Brasileiro,* this court held that a partially constructed drydock that broke its moorings during a sudden storm and collided with a vessel was subject to maritime jurisdiction.  *Bender,* 874 F.2d 1551, 1555-56 (11th Cir.1989). While a drydock is

---

[4]While the former Fifth Circuit in *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir.1973), utilized a four factor test in order to determine whether an activity bears a substantial relationship to a traditional maritime activity, we note that such an approach is permissive, not mandatory.  The Supreme Court in *Sisson* recognized that the *Kelly* test was only one approach to judging admiralty nexus, 497 U.S. at 365 n. 4, 110 S.Ct. 2892, as did this court in *Penton v. Pompano Constr. Co., Inc.,* 976 F.2d 636 (11th Cir.1992).

[5]Further, the Court explained that upon launching, "[s]he is capable of committing a tort and is responsible in damages therefor." *Id.* Finally, the court theorized that "if in taking the water during the process of launching, she escapes from the control of those about her, shoots across the stream and injures another vessel, she is liable in a suit *in rem* for damages." *Id.* at 438-39, 22 S.Ct. 195.

generally not considered a vessel,[6] "the drydock arguably became a 'vessel' when it entered the navigable waters of the Mobile River." *Id.* at 1555. The *Bender* court determined that jurisdiction properly vested through the tort branch of admiralty. Such is the case here. Since the allision occurred in navigable waters due to the imperfect mooring of a nearly complete vessel, the incident bore a substantial relationship to traditional maritime activity and was properly within admiralty jurisdiction.

In conclusion, we hold that Hull No. 40 constituted a "vessel" for purposes of admiralty tort jurisdiction, and that she is therefore subject to the burden shifting principles articulated in *The Louisiana.*[7]

B.     Act of God

Freeport also argues that it was not negligent in maintaining or securely mooring Hull No. 40 because Hurricane Opal was a *vis major,* an Act of God, that caused Hull No. 40 to break her moorings in spite of Freeport's reasonable diligence. A drifting vessel is presumptively liable for damages "unless it can show affirmatively that the drifting was the result of an inevitable accident, or a *vis major,* which human skill and precaution and a proper display of nautical skill could not have prevented." *The Louisiana,* 70 U.S. at 173, 18 L.Ed. 85. The burden of proving an inevitable accident or an Act of God rests heavily upon the vessel asserting such defense. *Boudoin v. J. Ray McDermott & Company,* 281 F.2d 81, 88 (5th Cir.1960).

Although Freeport avers that Hurricane Opal was a *vis major,* the district court determined that the winds buffeting Hull No. 40 were not of such force that no reasonable preparations would have prevented

---

[6]Courts have consistently found that a floating drydock is not a "vessel" within the meaning of admiralty jurisdiction when the drydock is moored and in use as a drydock. *Keller v. Dravo Corp.,* 441 F.2d 1239, 1244 (5th Cir.1971); *Bernardo v. Bethlehem Steel Co.,* 314 F.2d 604, 608 (2nd Cir.1963).

[7]In arguing that Hull No. 40 does not constitute a vessel for purposes of admiralty jurisdiction and that the Louisiana Rule should therefore not apply to Hull No. 40, Freeport cites cases invoking maritime jurisdiction under the Longshoreman and Harbor Workers' Compensation Act and the Jones Act. *See Rosetti v. Avondale Shipyards Inc.,* 821 F.2d 1083 (5th Cir.1987); *Williams v. Avondale Shipyards* 452 F.2d 955 (5th Cir.1971). We note, as the First Circuit noted in *DiGiovanni v. Traylor Bros., Inc.,* 959 F.2d 1119 (1st Cir.1992), that at least twenty-four maritime cases or maritime related statutes suggest slightly different wordings for the definition of vessel. We refuse to adopt the definition of vessel that Freeport urges, as it is based on unrelated statutes. Instead, we adhere to the example set in *Mink v. Genmar Industries, Inc.,* 29 F.3d 1543, 1546 n. 3 (11th Cir.1994): "[a]bsent applicability of a specific legislative scheme, the general definition of vessel applies." Congress articulated such a general definition. Pursuant to 1 U.S.C. § 3, " 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. This definition is consonant with the meaning attributed to the term "vessel" by the general maritime law. *I Benedict on Admiralty* § 165 at 10-13 (7th ed. rev.1994). Finally, the Ninth Circuit in *Hood v. Knappton Corp.* 986 F.2d 329, 1993 AMC 928 (9th Cir.1993), applied the Louisiana Rule to the owner of a log raft when the raft became untied, drifted into the channel, and collided with two fishing boats. *See id.* at 332. Having determined that maritime jurisdiction existed, the court applied the Louisiana Rule without further inquiry as to whether the log raft constituted a "vessel" under any other definition of the term.

her from breaking free from her moorings. Although hotly contested, the district court concluded that Hull No. 40 was subjected to sustained winds between 85 mph and 103.5 mph. There is abundant evidence in the record supporting the district court's findings with respect to the severity of the weather, and we do not believe the district court was clearly erroneous in finding that Hurricane Opal did not absolve Freeport from fault.

C.      The Pennsylvania Rule

 Finally, Freeport contends that it is not liable because Bunge was unlawfully obstructing Four Mile Creek. It is well established in admiralty law that when a plaintiff violates a federal statute, that plaintiff will be barred from recovering damages from a defendant unless that plaintiff can carry the burden of proving that its own violation could not have caused the loss of which it complains (the "Pennsylvania Rule"). *The Steamship Pennsylvania v. Troop,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). In other words, if Freeport could show that Bunge was violating a federal law at the time of the allision, Bunge would be precluded from recovering damages against Freeport, unless Bunge could prove that its own violation did not cause the damage to its grain conveyor.

 In an effort to invoke the Pennsylvania Rule, Freeport claimed that the Bunge grain-loading facility violated 33 U.S.C. § 403 by partially obstructing Four Mile Creek without a proper permit. Despite the fact that Freeport established that Bunge did not have the proper permit, the district court found that 33 C.F.R. § 330.3(b) (the "Grandfather Clause") absolved Bunge of such a requirement as long as the structure was (1) completed before December 18, 1968, and (2) did not interfere with navigation.

 Bunge's facility was completed before December 18, 1968, and did not interfere with navigation. Because Bunge was within the purview of the Grandfather Clause, it was not in violation of 33 U.S.C. § 403 and, therefore, not subject to the Pennsylvania Rule.

D.      Damages

 Bunge argues that the district court abused its discretion by awarding as damages $196,500.00 rather than $210,200.00. The differing amounts represent two bids proposed by a contractor to repair the conveyor facility. The contractor averred that if the main truss and conveyor system was spliced and the unbent portion was salvaged, then the lower price would sufficiently cover the cost of repair. Conversely, if the entire truss assembly had to be replaced, the higher price would be required to cover the cost of repair. The record fully supports the district court's award of the lower bid amount, and in light of the deference an appellate court

must afford a district court's ruling on damages, we affirm the $196,500.00 judgment.

The district court's failure to include in its calculation the cost of the damage survey and repair estimate fees, however, constitutes clear error. The cost of the services to survey the damages to the Bunge facility, specify repairs, and obtain bids totaled $5,852.50. The invoices were received into evidence without objection and Bunge timely demanded the costs before the district court. Not only are these costs ordinarily included in the damages of the case in chief,[8] Freeport graciously conceded in its own brief the probability of the district court's error. Accordingly, we hold the district court erred by omitting the surveying costs from Bunge's recovery.

In conclusion, we affirm the $196,500.00 judgment in favor of Bunge. We must, however, remand this case to the district court for its failure to include in its judgment the cost of the damage survey and repair estimate fees totaling $5,852.50. On remand, the district court should correct its judgment to include this amount.

AFFIRMED and REMANDED.

---

[8]*Pilot Transp. v. Chicago & N.W. Transp.,* 912 F.2d 967, 971 (8th Cir.1990); *In re Ta Chi Navigation (Panama) Corp.,* 513 F.Supp. 148, 155 (E.D.La.1981), aff'd, 728 F.2d 699 (5th Cir.1984); *see also Zanzibar Shipping, S.A. v. Railroad Locomotive Engine No. 2199,* 533 F.Supp. 392, 398 (S.D.Tex.1982) (court allowed survey costs that estimate the damages or repair costs).