[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-13005
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 12, 2006
THOMAS K. KAHN
CLERK

D.C. Docket No. 01-02872-CV-HS-NE

TREIBACHER INDUSTRIE, A.G.,

Plaintiff-Appellee,

versus

ALLEGHENY TECHNOLOGIES, INC.,
a Pennsylvania corporation, et. al.,

Defendants,

TDY INDUSTRIES, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(September 12, 2006)**

Before TJOFLAT and PRYOR, Circuit Judges, and GEORGE,[*] District Judge.

Tjoflat, Circuit Judge:

_____

[*] Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

# I.

## A.

This lawsuit arises out of two contracts, executed in November and December of 2000, respectively, whereby Treibacher Industrie, AG ("Treibacher"), an Austrian vendor of hard metal powders, agreed to sell specified quantities of tantalum carbide ("TaC"), a hard metal powder, to TDY Industries, Inc. ("TDY")[1] for delivery to "consignment." TDY planned to use the TaC in manufacturing tungsten-graded carbide powders[2] at its plant in Gurney, Alabama. After it had received some of the amount of TaC specified in the November 2000 contract, TDY refused to take delivery of the balance of the TaC specified in both contracts, and, in a letter to Treibacher dated August 23, 2001, denied that it had a binding obligation to take delivery of or pay for any TaC that it did not wish to use. Unbeknownst to Treibacher, TDY had purchased the TaC it needed from another vendor at lower prices than those specified in its contracts with Treibacher. Treibacher eventually sold the quantities of TaC of which TDY refused to take delivery, but at lower prices than those specified in its contracts

---

[1] TDY, a California corporation, is a subsidiary of Allegheny Technologies, Inc., a Pennsylvania corporation, which produces various metals and metal-based products.

[2] TaC is a component of tungsten-graded carbide powder, which is used to harden other metals.

2

with TDY. Treibacher then filed suit against TDY, seeking to recover the balance of the amount Treibacher would have received had TDY paid for all of the TaC specified in the November and December 2000 contracts.[3]

The case proceeded to a bench trial, where TDY and Treibacher disputed the meaning of the term "consignment" – the delivery term contained in both contracts. TDY introduced experts in the metal industry who testified that the term "consignment," according to its common usage in the trade, meant that no sale occurred unless and until TDY actually used the TaC. Treibacher introduced evidence of the parties' prior dealings to show that the parties, in their course of dealings (extending over a seven-year period), understood the term "consignment" to mean that TDY had a binding obligation to pay for all of the TaC specified in each contract but that Treibacher would delay billing TDY for the materials until TDY had actually used them. The district court ruled that, under the United

---

[3] Treibacher's complaint contains six counts. Count I is a claim for "Breach of Contract under the United Nations Convention on Contracts for the International Sale of Goods." Count II is a claim for "Anticipatory Breach of Contract" under the same United Nations convention. Count III is a claim for "Breach of Contract" under Alabama law. Count IV is a claim for "Moneys Owed and Unjust Enrichment" under Alabama law. Count V is a claim for "Conversion" under Alabama law. Count VI is a claim for "Misrepresentation," alleging that TDY misrepresented that it would accept and pay for the goods Treibacher shipped to it. Counts II through VI incorporate by reference the allegations of all previous counts.

On TDY's motion for summary judgment, the district court isolated Treibacher's claims from the complaint and granted the motion on all counts but Counts I and VI. The court, following a bench trial, gave Treibacher judgment on Counts I and VI, awarding Treibacher $5,327,042.85. Since we affirm the court's judgment on Count I, we need not review the court's disposition of Count VI.

Nations Convention on Contracts for the International Sale of Goods ("CISG"), opened for signature April 11, 1980, S. Treaty Doc. No. 9, 98th Cong., 1st Sess. 22 (1983), 19 I.L.M. 671, reprinted at 15 U.S.C. app. (1997), evidence of the parties' interpretation of the term in their course of dealings trumped evidence of the term's customary usage in the industry, and found that Treibacher and TDY, in their course of dealings, understood the term to mean "that a sale had occurred, but that invoices would be delayed until the materials were withdrawn."[4]  The court therefore entered judgment against TDY, awarding Treibacher $5,327,042.85 in compensatory damages (including interest).

B.

TDY now appeals.  TDY contends that, under the CISG, a contract term should be construed according to its customary usage in the industry unless the parties have expressly agreed to another usage.  TDY argues, in the alternative, that the district court erred in finding that, in their course of dealings, Treibacher and TDY understood the term "consignment" to require TDY to use and pay for all of the TaC specified in each contract.  Finally, TDY contends that, if we uphold

---

[4]  Although the parties presented conflicting evidence regarding the customary usage in the industry of the term "consignment," the district court did not make a finding regarding the customary usage of the term because it found that the parties had established a meaning for the term in their course of dealings, thus rendering customary usage irrelevant.

4

the district court's ruling that TDY breached its contracts with Treibacher, we should remand the case for a new trial on damages on the ground that the district court erroneously found that Treibacher reasonably mitigated its damages.

Reviewing the district court's legal conclusions de novo and factual findings for clear error, Newell v. Prudential Ins. Co., 904 F.2d 644, 649 (11th Cir. 1990), we hold that the district court properly construed the contract under the CISG – according to the parties' course of dealings – and did not commit clear error in finding that the parties understood the contracts to require TDY to use all of the TaC specified in the contracts.  As to the mitigation of damages issue, which we review for clear error, Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 923 (11th Cir. 2001), we find that the evidence before the district court supported its finding that Treibacher's mitigation efforts were reasonable under the circumstances.  We therefore affirm the judgment of the district court.

**II.**

A.

We begin our analysis by discussing the CISG, which governs the formation of and rights and obligations under contracts for the international sale of goods.

CISG, arts. 1, 4.[5]  Article 9 of the CISG provides the rules for interpreting the terms of contracts.  Article 9(1) states that, "parties are bound by any usage to which they have agreed and by any practices which they have established between themselves."  Article 9(2) then states that, "parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract . . . a usage of which the parties knew or ought to have known and which in international trade is widely known to . . . parties to contracts of the type involved in the particular trade concerned."  Article 8 of the CISG governs the interpretation of the parties' statements and conduct.  A party's statements and conduct are interpreted according to that party's actual intent "where the other party knew . . . what that intent was," CISG, art. 8(1), but, if the other party was unaware of that party's actual intent, then "according to the understanding that a reasonable person . . . would have had in the same circumstances," CISG, art. 8(2).  To determine a party's actual intent, or a reasonable interpretation thereof, "due consideration is to be given to all relevant circumstances of the case including the negotiations, any

_____

[5]  The parties do not dispute that the CISG governs their dispute.  Article 1 of the CISG provides, in relevant part, that it "applies to contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States."  The United States and Austria are contracting states.  Article 4 of the CISG provides, in relevant part, that it "governs . . . the formation of the contract and the rights and obligations of the seller and buyer arising from such a contract."  The parties dispute their respective "rights and obligations" under the contracts at issue in this case.

6

practices which the parties have established between themselves, usages and any subsequent conduct of the parties." CISG, art. 8(3).

In arguing that a term's customary usage takes precedence over the parties' understanding of that term in their course of dealings, TDY seizes upon the language of article 9(2), which states that, "parties are considered, unless otherwise agreed, to have made applicable to their contract" customary trade usages. TDY contends that article 9(2) should be read to mean that, unless parties to a contract expressly agree to the meaning of a term, the customary trade usage applies. In support of its argument, TDY points to the language of article (9)(1), which binds parties to "any usage to which they have agreed and by any practices which they have established between themselves." According to TDY, the drafters of the CISG, by separating the phrase "usages to which they have agreed" from the phrase "practices which they have established between themselves," intended the word "agreed," in article 9, to mean express agreement, as opposed to tacit agreement by course of conduct. Applying this definition to the language of article 9(2), TDY contends that contract terms should, in the absence of express agreement to their usage, be interpreted according to customary usage, instead of the usage established between the parties through their course of conduct.

TDY's construction of article 9 would, however, render article 8(3)

7

superfluous and the latter portion of article 9(1) a nullity. The inclusion in article 8(3) of "any practices which the parties have established between themselves," as a factor in interpreting the parties' statements and conduct, would be meaningless if a term's customary usage controlled that term's meaning in the face of a conflicting usage in the parties' course of dealings. The latter portion of article 9(1) would be void because the parties would no longer be "bound by any practices which they have established between themselves." Instead, in the absence of an express agreement as to a term's meaning, the parties would be bound by that term's customary usage, even if they had established a contrary usage in their course of dealings. We therefore reject TDY's interpretation of article 9(2), and, like the district court, adopt a reading that gives force to articles 8(3) and 9(1), namely, that the parties' usage of a term in their course of dealings controls that term's meaning in the face of a conflicting customary usage of the term. Cf. Gonzalez v. McNary, 980 F.2d 1418, 1420 (11th Cir. 1993) ("A statute should be construed so that effect is given to all its provisions, so that no part of it will be inoperative or superfluous, void or insignificant.").

B.

The district court did not commit clear error in finding that, in their course of dealings, TDY and Treibacher defined the term "consignment" to require TDY

8

to accept and pay for all of the TaC specified in each contract. The parties do not dispute that they executed, between 1993 and 2000, a series of contracts in which Treibacher agreed to sell certain hard metal powders, such as TaC, to TDY. In each instance, TDY discussed its needs with Treibacher, after which Treibacher and TDY executed a contract whereby Treibacher agreed to sell a fixed quantity of materials at a fixed price for delivery to "consignment." Treibacher then delivered to TDY the specified quantity of materials – sometimes in installments, depending upon TDY's needs.[6] TDY kept the materials it received from Treibacher in a "consignment store," where the materials were labeled as being from Treibacher and segregated from other vendors' materials. As it withdrew the materials from the consignment store for use, TDY published "usage reports," which documented the amounts of materials withdrawn. TDY sent the usage reports to Treibacher, and Treibacher, in turn, sent TDY invoices for the amounts of materials withdrawn at the price specified in the relevant contract. TDY then paid the invoices when they came due. In each instance, TDY ultimately withdrew and paid for the full quantity of materials specified in each contract.

A particularly telling interaction, the existence of which the parties do not

---

[6] TDY would notify Treibacher as to when it wanted to take delivery of portions of the quantity of materials provided for in each contract.

dispute, occurred in February 2000, when a TDY employee, Conrad Atchley, sent an e-mail to his counterpart at Treibacher, Peter Hinterhofer, expressing TDY's desire to return unused portions of a hard metal powder, titanium carbonitride ("TiCN"), which Treibacher had delivered. Hinterhofer telephoned Atchley in response and explained that TDY could not return the TiCN because TDY was contractually obligated to purchase the materials; Treibacher had delivered the TiCN as part of a quantity of TiCN that it was obligated to provide TDY under a contract executed in December 1999. Atchley told Hinterhofer that TDY would keep the TiCN. TDY subsequently used the TiCN and sent a usage report to Treibacher, for which Treibacher sent TDY an invoice, which TDY paid. This interaction – evidencing TDY's acquiescence in Treibacher's interpretation of the contract – along with TDY's practice, between 1993 and 2000, of using and paying for all of the TaC specified in each contract amply support the district court's finding that the parties, in their course of dealings, construed their contracts to require TDY to use and pay for all of the TaC specified in each contract.

C.

With respect to damages, the district court did not commit clear error in finding that Treibacher reasonably mitigated its damages. Article 77 of the CISG

10

requires a party claiming breach of contract to "take such measures as are reasonable in the circumstances to mitigate the loss." Article 77, however, places the burden on the breaching party to "claim a reduction in the damages in the amount by which the loss should have been mitigated." Treibacher's Commercial Director, Ulf Strumberger, and Hinterhofer testified that Treibacher sought to mitigate damages as soon as possible and ultimately obtained the highest prices possible for the quantity of TaC that TDY refused; their first sale in mitigation occurred on September 9, 2001, seventeen days after the date of TDY's letter denying its obligation to purchase all of the TaC. TDY, the party carrying the burden of proving Treibacher's failure to mitigate, presented no evidence showing that Treibacher did not act reasonably. The district court therefore had no basis upon which to find that Treibacher did not take reasonable steps to mitigate its losses.

## III.

In sum, the district court properly determined that, under the CISG, the meaning the parties ascribe to a contractual term in their course of dealings establishes the meaning of that term in the face of a conflicting customary usage of the term. The district court was not clearly erroneous in finding that Treibacher and TDY understood their contracts to require TDY to purchase all of the TaC

11

specified in each contract and that Treibacher took reasonable measures to mitigate its losses after TDY breached. Accordingly, the judgment of the district court is

**AFFIRMED.**