[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 18, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-15363
Non-Argument Calendar

_____

D. C. Docket No. 04-00625-CV-KD-1-C

IN THE MATTER OF THE COMPLAINT OF CENAC
TOWING COMPANY, INC., AS OWNER OF THE
BARGES CTCO-339 and CTCO-340, praying for
Exoneration from and/or Limitation of
Liability,

                                                    Petitioner-Appellant,

versus

SOUTHPORT, L.L.C.,
LULU'S LANDING, L.L.C.,

                                                    Claimants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(May 18, 2007)**

Before BIRCH, BLACK and MARCUS, Circuit Judges.

PER CURIAM:

Cenac Towing Company, Inc. ("Cenac"), as the owner of the barges CTCO 339 and CTCO 340, argues the district court erred by finding: 1) Lulu's Landing, L.L.C. ("Lulu's") and Southport, L.L.C. ("Southport") established by a preponderance of the evidence that barges CTCO 339 and CTCO 340 caused the damage suffered by Lulu's and Southport; and, 2) Cenac failed to establish its affirmative defense that the casualty was caused by an Act of God. We AFFIRM.

## I. BACKGROUND

Although the district court made extensive findings, we set forth only the findings necessary to place the issues in context. Cenac commenced this limitation of liability action to obtain a concursus of proceedings to adjudicate all damage claims allegedly caused by its two barges, the CTCO 339 and the CTCO 340, when, during Hurricane Ivan, the barges broke free from their mooring and drifted unmanned in the Intracoastal Waterway on 16 September 2004.

Barges CTCO 339 and CTCO 340 are double-skinned tank barges measuring 297.5 feet in length, 54 feet in width, and 12 feet in depth. Kyle Clement, an employee of Cenac, was the captain of the M/V OVIDE J. CENAC ("M/V CENAC") during the relevant time period. Southport was the property owner of the land where Lulu's, the damaged restaurant, was located. Lulu's

leases a restaurant from Southport.

On 10 September 2004, the M/V CENAC filled the CTCO 339 and CTCO 340 with gasoline and departed for Biloxi, Mississippi. Captain Clement stated that he checked weather conditions prior to embarking on the voyage and was aware of the advisories issued regarding Hurricane Ivan. He knew he had a small window of time in which to make the trip to Pensacola, Florida and back before the storm but decided to proceed. While in Pensacola, he was informed that the vessel he was piloting would not be permitted to stay at the dock at which he was moored due to the approaching storm.

Ray Sick, Cenac's Operations Manager, stated that his department monitors the weather through various news outlets and National Oceanic and Atmospheric Administration reports. Sick stated that the crews understand that riding out hurricanes on vessels is part of their job. Cenac, however, conducts no training of any type for its crews in dealing with severe weather, and does not have a severe weather contingency plan.

Captain Clement decided to tie up the flotilla in the Alabama Canal. The barges were tied up side-by-side, as opposed to in a line. Captain Clement used seven of the eight mooring cleats on the shore side of the barge, as one of the cleats was blocked by thick foliage and heavy limbs. As a result, seven lines ran from

3

one of the barges to various trees on the shoreline. There were no lines from the tug to the shore, and the crew did not put any reinforcing lines from the tug to the barges in anticipation of the approaching storm; rather, the tug was tied up to the barges as for a normal tow. While the crew waited for the arrival of the storm, Captain Clement testified that he saw a barge tied to the east side of Lulu's.

When Hurricane Ivan reached the vessel, Captain Clement stated that the tug engines were running, but he was not applying any pressure with the engines to help hold the barges against the shore. During the early morning hours of 16 September 2004, one of the trees the crew had tied a line to uprooted, and the entire flotilla began to swivel into the canal. The tug grounded on the south bank, which broke all of the face lines connecting it to the barges. Captain Clement testified that he did not know what happened to the barges as they were carried down the canal. Although he was awake all night, he did not see any other large objects floating down the canal that night.

Across the canal, Captain Frederick Coley, Jr. rode out the storm on his vessel, the F/V AMBER GENE. Other than the occasional transient ship prior to the storm, Captain Coley testified that he did not see any vessels tied up on the north side of the canal near Lulu's. During the storm, Captain Coley and his friend, Gregory Oliver, heard loud crashing noises from across the canal. When

4

they went out onto the ship's deck to investigate, he noticed that the lower level lights at Lulu's were blocked by two large tank barges. Shortly after hearing the loud noises, the two barges floated within six feet of him and hit two barges owned by Harold Sherman. One of Sherman's barges then broke loose from its moorings.

During the storm, Captain Coley saw that Lulu's east end had incurred damage and that part of the roof had collapsed. Captain Coley also observed that Sherman's barge became stuck under a highway bridge. After the wind changed directions, it pushed Sherman's barge across the canal until it came to rest at the pilings on Lulu's west end. Captain Coley testified that Sherman's barge never reached the east end of Lulu's, and testified that Sherman's barge did not cause the damage to Lulu's eastern side. Oliver's testimony largely corroborated Captain Coley's account. Sherman testified that no vessel was tied up close to Lulu's east side prior to the storm.

## II. STANDARDS OF REVIEW

In an action tried without a jury, the district court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed. R. Civ. P. 52(a). Likewise, we review for clear error a district court's findings on the questions of statutory fault, negligence, causation, and damages. See Am.

5

Dredging Co. v. Lambert, 153 F.3d 1292, 1295 (11th Cir.1998) (citations omitted) (regarding negligence and proximate cause); Simmons v. Conger, 86 F.3d 1080, 1084 (11th Cir.1996) (citation omitted) (regarding damages); Orange Beach Water, Sewer & Fire Prot. Auth. v. M/V Alva, 680 F.2d 1374, 1380 (11th Cir.1982) (citations omitted) (regarding statutory fault). We will not find the district court committed clear error unless, "after assessing the evidence, [we are] left with a definite and firm conviction that a mistake has been committed." Worthington v. United States, 21 F.3d 399, 400 (11th Cir.1994) (quotations and citation omitted). "We review the district court's conclusions of law de novo." Am. Dredging Co., 153 F.3d at 1295.

### III. DISCUSSION

A. Causation

Cenac contends the district court improperly viewed the damage as either coming from Cenac's barges or the Sherman barge. Cenac's argument that the district court erred in purportedly ruling out *only* the Sherman barge, however, misapprehends the district court's well-reasoned opinion. After hearing evidence regarding various free-floating objects and moored vessels from multiple witnesses, the district court credited the testimony of Captain Coley and his friend, Oliver. Captain Coley and Oliver testified that while other objects, such as debris,

6

were in the waterway the night in question, they did not see anything that could have caused the damage to Lulu's east side, other than the two barges they saw float by them.

Cenac also argues that its barges could not have caused the damage to Lulu's because they were too large. The district court, however, found this position unpersuasive because it was based, in part, on an unsupported assumption regarding the water level at the time of the damage. Cenac's expert admitted that he had no direct evidence to support his assumption.

Upon review of the evidence presented on the issue of causation, we determine the district court had ample evidence to support its findings. As a result, we are not "left with a definite and firm conviction" that the district court erred. See Worthington, 21 F.3d at 400 (11th Cir.1994) (quotations and citation omitted).

B. Act of God Defense

Cenac asserts that the district court committed clear error in finding that the Act of God defense was inapplicable. An Act of God is "any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pain or care, reasonably to have been expected, could have been prevented." Traveler's Ins. Co. v. Randall, 264 F.2d 1, 2 (5th Cir. 1959); see also Warrior & Gulf Navigation Co. v. United States, 864 F.2d 1550, 1553 (11th Cir.

7

1989) ("Act of God" defense "applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them") (quotation omitted). "The burden of proving an inevitable accident or an Act of God rests heavily upon the vessel asserting such defense." Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 926 (11th Cir. 2001) (citation omitted).

Cenac bears the heavy burden of proving affirmatively "that the drifting was the result of an inevitable accident, or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." See Bunge, 240 F.3d at 926 (citation omitted). The district court found that Cenac failed to meet this burden. Specifically, the district court found that the captain of the M/V OVIDE J. CENAC was negligent in tying up the barges side-by-side in the canal, rather than single file, and in failing to use the tugs' engines to help keep the barges against the shore. Additionally, the district court concluded that Cenac "demonstrated that [it was] subjected to sustained winds of approximately 84 miles per hour with gusts at some point during the storm [] in excess of 100-115 miles per hour." R100 at 9. The district court looked to our holding in Bunge, wherein we upheld the district court's finding that wind speeds of during Hurricane Opal between 85 and 103.5 miles per hour "were not of such force that no reasonable

8

preparations would have prevented [the ship] from breaking free of her moorings." 240 F.3d at 926. Similarly here, the district court did not find the relevant wind speeds of Hurricane Ivan "were of such force that no reasonable preparations would have prevented the barges from breaking loose." R100 at 9. There is evidence in the record supporting the district court's finding with respect to the severity of the weather, and we do not believe the district court was clearly erroneous in finding that Hurricane Ivan did not absolve Cenac from fault.

## IV. CONCLUSION

We accordingly **AFFIRM** the district court's judgment.