[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 19, 2007
THOMAS K. KAHN
CLERK

No. 06-10661
_____

D.C. Docket No. 04-CV-81131-CV-KLR

DAVID T. FISCHER, individually,

Plaintiff-Appellant,

ALFRED J. FISHER,

Intervenor-Plaintiff-Appellant,

versus

S/Y NERAIDA, her engines, tackle, rigging,
dinghies, equipment, appurtenances, furniture, etc., in rem,
NERAIDA CO., L.P., a Michigan Limited Partnership,
PETER SIAVRAKAS, in personam

Defendants-Intervenor-
Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 19, 2007)

Before TJOFLAT, HULL and BOWMAN,* Circuit Judges.

TJOFLAT, Circuit Judge:

_____

*Honorable Pasco Bowman, II, United States Circuit Judge for the Eighth Circuit, sitting by designation

This case arose from an allision between an unmanned pleasure yacht and a dock when Hurricane Frances hit south Florida in early September of 2004.[1]  The district court found that the yacht-owner exercised reasonable care in preparing for the storm and accordingly exonerated him and his boat from liability.  The dock owner now appeals.  Because the district court applied the proper standard of care and correctly allocated the burden of proof, and because its factual determinations are not clearly erroneous, we affirm the court's judgment.

## I.

### A.

The S/Y Neraida is a sailing yacht, a ketch.  It was anchored in Lake Worth in Palm Beach during the early morning hours of September 5, 2004, when Hurricane Frances made landfall on the southeast coast of Florida.  By mid-morning, the Neraida had drifted eastward across the lake and come to rest, leaning against a dock owned by David Fischer; the dock suffered substantial damage as a result of the impact.

The Neraida was beneficially owned by Peter Siavrakas, a Michigan businessman and yachting enthusiast, through his 98 percent interest as the general

---

[1]An allision occurs when a moving vessel strikes a stationary object such as a dock.  A collision occurs when a moving vessel strikes another moving vessel.

partner in Neraida Co., L.P., a Limited Partnership, the Neraida's title owner. Siavrakas purchased the yacht in 1997 and until late 2000 had operated it as a charter vessel in the Caribbean. The Taiwanese-built Neraida measured over 65 feet bow to stern with a draft of 7 feet, 8 inches,[2] a mast height of 80 feet, and a displacement of approximately 75,000 pounds.

Siavrakas and his family lived during most of the year in Michigan and, prior to 2001, would periodically travel to the Caribbean to use the Neraida for pleasure sailing. In 2001, the charter business dried up, and Siavrakas, his family, and a small crew sailed the Neraida from the Caribbean north to Rhode Island, and back south to Palm Beach, Florida.

When Siavrakas arrived in Palm Beach, he searched for a place permanently to anchor the Neraida and settled on Lake Worth, where he found many other boats moored. A nearby marina, the Rybovich, Spencer Marina, accommodated the Neraida's dinghy, which Siavrakas used to go out to the Neraida anchored in the lake. When the Neraida was not being used, the dinghy remained docked at the marina.

---

[2]The draft is the average vertical distance between the waterline and the bottom of the boat's hull.

Between late-2001 and September 2004, Siavrakas continued to travel periodically from Michigan to Florida to sail in the Neraida for weeks or months at a time. While Siavrakas was in Michigan, he arranged to have a friend in Palm Beach, Gregory Afthinos, act as a caretaker for the Neraida. Afthinos, an engineer trained in the Greek Royal Navy and merchant marine academy, had worked previously aboard ocean-faring freighters and cruisers. On several occasions, he sailed with Siavrakas and his family aboard the Neraida. Once the yacht was moored in Lake Worth, Afthinos's task was to check on it weekly, to inspect it for vandalism and wear-and-tear. He last checked on the yacht approximately a week before Hurricane Frances struck.

Sometime during 2002, Siavrakas decided to sell the Neraida. One interested buyer was Steven Cienkowski, a licensed captain in Palm Beach who wanted to put the yacht back into the charter business. Cienkowski owned three smaller boats, two that he used to take passengers out on fishing and SCUBA diving trips, and a third single-mast sailboat. Siavrakas and Cienkowski never made a deal for the sale or lease of the Neraida, but the two kept in touch over their shared interest in sailing.

Siavrakas first became aware of Hurricane Frances, then designated a tropical storm,[3] on August 26, 2004.  On the following day, when Frances was designated a hurricane, it was still some 2000 miles off the coast of Florida.  A large and slow-moving system, the storm lumbered its way west and then north through the Caribbean over the next several days.  A hurricane watch was first issued on September 1, for the entire Atlantic coast of Florida between Flagler Beach in the north and Florida City in the south.  The National Hurricane Center first issued a hurricane warning on September 2, once again covering the entire east coast of the state.[4]

While Frances was gaining strength in the Caribbean, Siavrakas was not in Florida; he had not been there since June 2004.  Consequently, he did not personally carry out the preparations for the hurricane.  Siavrakas contacted Afthinos and Cienkowski, instead, on Wednesday, September 1, and instructed them to prepare the Neraida for the storm by setting a second anchor and removing the sails.  Siavrakas had decided by then to keep the yacht in Lake Worth instead

---

[3]The National Hurricane Center's classification scheme designates as tropical storms those systems with maximum sustained wind speeds between 39 and 73 miles per hour; hurricanes are storm systems with sustained wind speeds of at least 74 miles per hour.

[4]A hurricane watch is an advisory issued by the National Hurricane Center indicating that hurricane conditions are possible within the following 36 hours.  A hurricane warning indicates that a hurricane is expected within the following 24 hours.

of moving it to a different location for the storm. Afthinos and Cienkowski agreed to meet by the yacht to make the preparations on Thursday, September 2, but due to scheduling conflicts, Cienkowski wound up going out to the Neraida alone, on the evening of Friday, September 3.

Once aboard the yacht, Cienkowski first ensured that the sails were tied and secured to the masts. He did not remove the sails because heavy winds had already reached the area. He dropped the yacht's secondary anchor; the main anchor had already been lowered and set. The main anchor was a 110-pound Coastal Quick Release ("CQR") design favored by many sailors for boats of comparable size. Attached to the yacht by a 120-foot-long chain, the anchor had the ability to set itself – i.e., dig a firm hold into the ground – when the yacht begins to move. The secondary anchor was also a CQR design; it weighed about 65 pounds and was attached to a 30-foot chain and 30-foot nylon rope. In preparing the Neraida, Cienkowski spent a total of thirty minutes on board.

The eye of Frances finally made landfall during the early morning of September 5, some forty miles north from where the Neraida was anchored, though the area around Palm Beach had been experiencing tropical storm–force winds since earlier in the night on September 4. Given the larger-than-average size of the storm system, this forty-mile distance put the Neraida directly in the eye

wall of the storm, where the winds are most intense. According to the uncontroverted testimony of Siavrakas's meteorology expert, Dr. Lee Branscome, the area surrounding the Neraida experienced gusts of hurricane-force winds for six to eight hours and sustained hurricane-force winds for about three hours during the night of September 4.

By midday on September 5, when Cienkowski returned to the yacht's anchorage site, he saw that many of the other boats moored in the area had been severely damaged during the night. The Neraida was found leaning against David Fischer's dock, which had been damaged from the impact. In addition to the damage it sustained from alliding with the dock, the Neraida lost its main sail, which had become unfurled during the storm and mostly destroyed by the wind. The mizzen, located rearward, was unfurled but had not been raised or torn. Two additional sails remained covered up and furled during the storm.

B.

David Fischer brought this action in the District Court for the Southern District of Florida on December 9, 2004. He sued the Neraida <u>in rem</u> and Siavrakas and the Neraida Co., L.P. <u>in personam</u>.[5] We refer to the defendants

---

[5]Alfred Fisher, a neighbor of David Fischer, obtained leave of court to intervene as a plaintiff. He alleged that the Neraida had also damaged his dock during the storm before it came to rest against Fischer's dock. The parties have postponed litigating Alfred Fisher's claims

collectively as "Siavrakas."  The gist of Fischer's complaint is that Siavrakas is

liable for the damage to Fischer's dock for negligently failing to secure the

Neraida prior to the hurricane.  In a separate action, Neraida Co., L.P. sued for

exoneration or limitation of liability to the value of the Neraida.  See 46 U.S.C. §

30505.  The district court, sitting in admiralty, 28 U.S.C. § 1333, consolidated the

two actions and held a two-day bench trial on the issue of liability alone.

At trial, the testimony consisted predominately of the opinions of both

sides' expert witnesses.  Thomas Correll, Fischer's expert and an inland marine

consultant, testified that several of Siavrakas's acts and omissions in preparation

for the hurricane were unreasonable.  Specifically, he testified that the sails should

have been removed instead of merely furled, that the second anchor should have

been set manually instead of being dropped overboard and allowed to self-set,[6] and

that the Neraida should have been moved to a different location altogether.  In

contrast, Siavrakas's expert, Thomas Danti, testified that the primary purpose of

removing sails is to prevent them from getting damaged rather than to prevent a

---

pending the final disposition of the issue of liability in David Fischer's case.  Therefore, in this appeal, David Fischer is the sole appellant.

[6]An anchor "sets" when it digs into the sea bottom; a ship can set an anchor by moving slightly after dropping the anchor.  Correll acknowledged on cross-examination that the Neraida's secondary anchor, which Cienkowski dropped but did not manually set, can set itself if the yacht moves during the storm.

vessel from moving, that additional anchors are often not helpful to a ship caught in shifting storm winds, and that it was reasonable to leave the Neraida anchored in Lake Worth.

The district court resolved the issue of liability in the findings of facts and conclusions of law it handed down following the bench trial. In its conclusions of law, the court held that Siavrakas bore the burden of proving that his actions in securing the Neraida were reasonable. The court found that although Hurricane Frances was an act of God, its force was not so severe that no amount of precaution could have avoided the accident. Nonetheless, the court found that because Siavrakas's measures to secure the Neraida were reasonable, Siavrakas was not liable for the damage to Fischer's dock and was entitled to exoneration under 46 U.S.C. § 30505. The court entered a partial final judgment for Siavrakas pursuant to Federal Rule of Civil Procedure 54(b), and this appeal followed.

## II.

We have jurisdiction to review the district court's judgment. 28 U.S.C. § 1291. We review the court's conclusions of law de novo. See United States v. Kennedy, 201 F.3d 1324, 1329 (11th Cir. 2000). The district court's findings of fact – including determinations of the credibility of witnesses and weight of the evidence – will not be set aside unless they are clearly erroneous. See Fed. R. Civ.

P. 52(a); Dresdner Bank AG v. M/V Olympia Voyager, 446 F.3d 1377, 1380–81 (11th Cir. 2006) (citing McAllister v. United States, 348 U.S. 19, 20, 75 S. Ct. 6, 8, 99 L. Ed. 20 (1954)). The court's findings will stand as long as they are supported by substantial evidence. See Thelma C. Raley, Inc. v. Kleppe, 867 F.2d 1326, 1328 (11th Cir. 1989). In "a case in which the evidence is largely testimonial," like this one, "the district court has the advantage of observing the witnesses and evaluating their credibility firsthand," and "the standard of review imposes an especially heavy burden on an appellant." Id.

Fischer raises four arguments in support of reversal. First, he submits that the district erred by failing to shift the burden to Siavrakas to prove that his actions in preparing the Neraida were reasonable. Second, he argues that the court should have held Siavrakas liable when it found that Hurricane Frances was not so severe as to make the accident inevitable.[7] Third and finally, he argues that Siavrakas's preparations were not reasonable and that the district court made a clear error when it decided otherwise.

A.

---

[7] Fischer also challenges as clearly erroneous the court's factual finding that Hurricane Frances was an act of God. Given the distinction between the act of God doctrine and the applicable standard of care, discussed infra, this question is not relevant to the disposition of the appeal and will not be taken up in this opinion.

10

The first argument Fischer raises rests on but a single ambiguous sentence in the district court's conclusions of law. The court stated in the final section of its conclusions that "[b]ecause Plaintiffs have failed to prove that Defendants were negligent in their hurricane preparations with regard to the S/Y Neraida, they are not entitled to recover." Fischer submits that this statement meant that the district court placed the burden of persuasion on the plaintiffs instead of the defendants as required by the presumption articulated in The Louisiana, 70 U.S. (3 Wall.) 164, 18 L. Ed. 85 (1865). Id. at 173 (holding that the vessel must "show affirmatively" that it is not liable); see also Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 923 (11th Cir. 2001) ("When a moving ship strikes and damages a stationary object, it is presumed that the moving ship is at fault.").

Reading the conclusions of law in its entirety convinces us that the district court correctly shifted the burden of proof to Siavrakas. Indeed, the court stated that Siavrakas is "relieved from liability only if [he] can show that the damage caused to [Fischer's] dock[] could not have been prevented by the exercise of reasonable care." (emphasis added) However, once Siavrakas demonstrated to the court's satisfaction that his preparations were reasonable, the presumption that the moving vessel was at fault was overcome. Because the court properly invoked the presumption of the Louisiana Rule, we reject Fischer's argument.

11

B.

In essence, Fischer's second argument boils down to the proposition that the Louisiana's burden-shifting rule converts the liability standard in allision cases from ordinary negligence into something much more demanding. This is incorrect. The duty of care owed by a moving vessel to a stationary object is reasonable care under the circumstances. Thus, if a ship's owner acted reasonably in preparing for a storm, the owner is not liable even if the ship eventually causes damage to another's property. Fischer conflates the applicable standard for negligence with the act of God doctrine. The act of God defense is a distinct argument that rebuts causation by establishing a superceding cause of the accident. Defendants in allision cases need not, of course, prove a superceding cause in order to disprove negligence.

1.

Liability in collision and allision cases has always been apportioned based on fault. See 2 Thomas J. Schoenbaum, Admiralty and Maritime Law 89 (4th ed. 2004). In practice, however, evidence of fault is often in the exclusive control of the defendant in a collision action. See Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 923 (11th Cir. 2001). Several judicial presumptions similar to the doctrine of res ipsa loquitur have evolved to shift the burden of production and

persuasion to the defendant.  See 2 Schoenbaum, supra, at 105 (analogizing to res ipsa loquitur).  Of present concern are two related doctrines most commonly associated with The Louisiana, 70 U.S. (3 Wall.) 164, 18 L. Ed. 85 (1865), and The Oregon, 158 U.S. 186, 15 S. Ct. 804, 39 L. Ed. 943 (1895).  The Oregon Rule states that when a vessel moving under its own power allides with a stationary object, the moving vessel is presumptively at fault.  See The Oregon, 158 U.S. at 197, 15 S. Ct. at 808.  The Louisiana Rule is the same except that it applies to vessels moving or drifting due to an external force, such as the current or the wind.  See The Louisiana, 70 U.S. (3 Wall.) at 173; Superior Const. Co. v. Brock, 445 F.3d 1334, 1339 n.10 (11th Cir. 2006) (comparing the two rules).

Applying either of these rules creates a presumption that the moving vessel was negligent, but the presumption is rebuttable through any one of three ways. The defendant can demonstrate: "[1] that the allision was the fault of the stationary object[;] [2] that the moving vessel acted with reasonable care[;] or [3] that the allision was an unavoidable accident."  Freeport Marine Repair, 240 F.3d at 923. These three defenses might be analogized to the common law tort arguments of contributory negligence, denial of negligence, and superceding causation, respectively.  Each independent argument, if sustained, is sufficient to defeat liability.  Siavrakas does not argue that Fischer was negligent in the construction

or placement of his dock; thus, the first defense is not applicable to the present case. We accordingly turn to the second defense, which Siavrakas does raise, namely that he exercised reasonable care in preparing the Neraida for the hurricane.

The appropriate standard of care in this regime is based upon "(1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules . . . ; and (3) recognized customs and usages." 2 Schoenbaum, supra, at 90. The case law has consistently embraced this standard. In The Louisiana, the Supreme Court applied a fault-based test, and concluded that the facts of the case required "no assumption or affectation of any very great nautical skill in this court" to discern "defect[ive]" management of the Louisiana by her captain and crew. 70 U.S. (3 Wall.) at 174. The Court found that the allision was caused by the crew's "want of judgment," evidenced in part by the fact that "other persons of nautical skill . . . found no difficulty in securing their vessels at the same place, and under similar circumstances." Id. In short, the Court concluded that the crew was obviously negligent.

Collision cases decided subsequent to The Louisiana also understood the standard of care in admiralty to be reasonable care under the circumstances, and not a higher standard. See The Virginia Ehrman, 97 U.S. 309, 313, 24 L. Ed. 890

14

(1877) (ascribing liability when "the master or crew of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence"); The Clarita, 90 U.S. (23 Wall.) 1, 11, 23 L. Ed. 146 (1874) (stating that vessels are liable for accidents due to the "negligence, want of care or skill on the part of those employed in their navigation"). Particularly instructive is the The Grace Girdler, in which the Supreme Court stated that "[t]he highest degree of caution that can be used is not required" when a ship is "pursuing a lawful avocation in a lawful manner," and that "[i]t is enough that it is reasonable under the circumstances." 74 U.S. (7 Wall.) 196, 203 19 L. Ed. 113 (1868).

Cases of more recent vintage are no less consistent in their adherence to a reasonable-care standard. In Petition of the United States, 425 F.2d 991, 995 (5th Cir. 1970),[8] we stated that "[t]he test for determining whether [defendants] were free from fault is whether they took reasonable precautions under the circumstances as known or reasonably to be anticipated." See also Superior Const. Co. v. Brock, 445 F.3d 1334, 1339–40 (11th Cir. 2006); Hercules Carriers, Inc. v. Claimant State of Fla., 768 F.2d 1558, 1564 & n.3 (11th Cir. 1985); S.C.

---

[8]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Loveland, Inc. v. E. W. Towing, Inc., 608 F.2d 160, 166 (5th Cir. 1979); Bunge

Corp. v. M/V Furness Bridge, 558 F.2d 790, 802 (5th Cir. 1977); Stuart Cay

Marina v. M/V Special Delivery, 510 F. Supp. 2d 1063, 1072 (S.D. Fla. 2007).

Applied to the context of hurricane preparations, reasonable care amounts to

whether the owner "use[d] all reasonable means and took proper action to guard

against, prevent or mitigate the dangers posed by the hurricane." Stuart Cay

Marina, 510 F. Supp. 2d at 1072. Although what "reasonable care" requires

changes with the circumstances, that standard recognizes the existence in every

case of something more that could be done – and perhaps would be legally

required under a "highest degree of caution" standard – but that reasonable care

does not demand.

Our sister circuits have also consistently applied the reasonable care

standard in allision and collision cases. In Weyerhaeuser Co. v. Atropos Island,

777 F.2d 1344 (9th Cir. 1985), the Ninth Circuit held that the standard of

reasonableness is no more stringent in the maritime context than in ordinary tort.

Id. at 1348. Similarly, the Seventh Circuit opined that "negligence at sea does not

differ, in principle, from negligence ashore." Rodi Yachts, Inc. v. Nat'l Marine,

Inc., 984 F.2d 880, 886 (7th Cir. 1993) (quoting Grant Gilmore & Charles L.

Black, Jr., The law of Admiralty § 7-11 (2d ed. 1975)); see also Stolt

16

Achievement, Ltd. v. Dredge B.E. Lindholm, 447 F.3d 360, 364 (5th Cir. 2006) ("The applicable standards of care in a collision case stem from traditional concepts of prudent seamanship and reasonable care . . . ."); Cliffs-Neddrill Turnkey Int'l-Oranjestad v. M/T Rich Duke, 947 F.2d 83, 91 (3d Cir. 1991); Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1156 (2d Cir. 1978); United States v. The Washington, 241 F.2d 819, 824 (4th Cir. 1957). We find no authority and discern no reason now to impose upon defendants in allision cases a higher standard of care than ordinary reasonableness.

2.

Fischer points us to prior cases in which we have referred to the burden facing a defendant seeking to overcome the Louisiana Rule's presumption of fault as "heavy" or "strong." See, e.g., Freeport Marine Repair, 240 F.3d at 923. This language, Fischer argues, must mean that the defendant needs to prove that it did more than what is merely reasonable in order to avoid liability. These adjectives connote no such higher standard of conduct. Rather, they simply mean that the Louisiana and Oregon Rules' presumption against the defendant is "strong" in the sense of imposing a burden of persuasion upon the defendant, and not just a

17

burden of production or of going forward.[9]  See id.; Rodi Yachts, 984 F.2d at 886

(acknowledging but criticizing courts' use of the "strong" presumption).

Fischer also argues that because the district court found that Hurricane

Frances was not "so catastrophic that no reasonable preparations could have

prevented the vessel from breaking free of its moorings," Siavrakas was required

to prove that he could not have possibly prevented the accident.  In support of his

position, Fischer relies principally on language in The Louisiana that has since

been repeatedly recited, namely that a defendant whose vessel has struck the

plaintiff's property is liable unless he can "show affirmatively that the drifting was

the result of inevitable accident, or a vis major, which human skill and precaution,

and a proper display of nautical skill could not have prevented."  70 U.S. (3 Wall.)

at 173.  Fischer contends that this, the so-called act of God defense, requires the

defendant to prove that it took not just one reasonable course of action among

many, but all reasonable measures.  The Supreme Court applies this test, however,

to an argument of superceding causation, not to a denial of negligence.  In The

---

[9]Strong presumptions shift the burden of persuasion to the defendant such that even if the defendant presents exculpatory evidence, the jury still has to find that a preponderance of the evidence outweighs the facts presumed in favor of the plaintiff.  2 McCormick on Evidence § 344 (6th ed. 2006).  In contrast, "weak" presumptions are mere inferences in the plaintiff's favor that carry no weight in opposition to actual exculpatory evidence.  A memorable simile describes "weak" presumptions to be "like bats of the law flitting in the twilight, but disappearing in the sunshine of actual facts."  Id.

Louisiana itself, the Court concluded that the defendant had been negligent in anchoring the vessel to the dock. Thus, the only available defense to the defendant in that case was the assertion of a superceding cause. Accordingly, the Court looked to whether the change in tides would have unmoored the vessel even had all reasonable preparations been made. Id. at 174.

The act of God defense denies that the defendant's acts or omissions, even assuming they did not meet the standard of reasonable care under the circumstances, caused the accident. See Warrior & Gulf Navigation Co. v. United States, 864 F.2d 1550, 1553 (11th Cir. 1989) ("A party may be deemed negligent yet still be exonerated from liability [i]f the act of God would have produced the same damage irrespective of the party's negligence."). Such accidents are "inevitable" or "unavoidable" in the sense of being overdetermined. In other words, the accident would have happened anyway regardless of what the defendant did. This defense sensibly requires a showing that all reasonable measures would have been futile.

Siavrakas's position, as well as the district court's, did not contest causation but rather negligence. All of Siavrakas's experts' trial testimony went to show that the decision to leave the Neraida in Lake Worth with two anchors was at least as reasonable a course of action – if not more so – than attempting to move the

19

boat elsewhere. Likewise, the court stated that Siavrakas "took reasonable precautions under the circumstances as known or reasonably to be anticipated [] to prepare the S/Y Neraida for Hurricane Frances." As a practical matter of proof, the two defenses will often rely on the same evidence because it may be difficult to persuade the fact-finder that a storm was so fierce as to make an accident inevitable without first demonstrating that the defendant did everything in his power to prevent the accident. But as a doctrinal matter, asserting that the defendant took reasonable care does not require the proof that even supra-reasonable care would not have prevented the accident.

C.

Fischer lastly challenges as clearly erroneous the district court's finding that Siavrakas took reasonable care in preparing for Hurricane Frances. Reasonable care in this context is "that of prudent men familiar with the ways and vagaries of the sea." Petition of the United States, 425 F.2d 991, 995 (5th Cir. 1970). Applying this standard, Fischer points to three specific acts and omissions that he contends demonstrate Siavrakas's negligence and the district court's clear error.

First, Fischer argues that Siavrakas was negligent in failing to remove the Neraida's sails. However, Fischer's expert, Thomas Correll, did not have an opinion on whether the sails, two of which had become unfurled during the storm,

20

posed any significant risk of moving the Neraida from its anchorage. He also acknowledged that one sail that was severely damaged during the storm was not in a configuration that would have generated any force to move the boat. Thomas Danti, Siavrakas's expert, testified that removing the sails before a storm is advisable because it protects the sails, but that leaving them furled does not pose a risk of causing the boat to break anchorage.

Second, Fischer contends that Siavrakas failed to show that the Neraida's anchorage was reasonable for the storm. Specifically, he argues that the Neraida should have had more than two anchors, and that, at the very least, the secondary anchor should have been set manually instead of dropped from the side of the boat. Prior to trial, Correll had stated in an affidavit that using three anchors would have been reasonable in this situation. During the trial, he retreated from this position on cross-examination when he was presented with an authoritative treatise and conceded that in shifting wind conditions using fewer anchors is often safer. This testimony is consistent with that offered by Danti, who stated that dropping a secondary anchor was probably not even necessary. Additionally, both Danti and Correll appear to agree that the Neraida's secondary anchor sets itself once the boat begins to move such that manual setting is unnecessary.

21

Third, Fischer also argues that Siavrakas should have moved the Neraida to a different location after he first learned about Frances on August 26 but before the first hurricane warnings were issued on September 1. The parties presented copious testimony at trial from the dueling experts on the reasonableness of Siavrakas's decision to keep the Neraida in Lake Worth. Fischer's proffered alternative was to move the boat to New River, which is further south near Fort Lauderdale, even before it became clear where Frances was going to hit. However, it seemed doubtful whether the Neraida could have made it that far even in clear weather given the boat's seven-foot draft and stretches of shallow water between Lake Worth and New River. The district court apparently credited Danti's testimony that keeping the Neraida in Lake Worth was a reasonable decision in light of the uncertainty over the storm's movement, the hazards of navigating in shallower waterways, and the risks of docking in more densely packed anchorages further south, where boats are more likely to suffer damage from flying debris during a storm. On the record before us, there appears to be substantial evidence to support the district court's findings, and thus we cannot conclude that the court made a clear error in finding Siavrakas's actions to be reasonable under the circumstances.

### III.

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**